The PROCTER & GAMBLE COMPANY, Plaintiff,

v.

JOHNSON & JOHNSON INCORPORATED and Personal Products Company, Defendants.

No. 78 Civ. 5638(PNL).

United States District Court, S. D. New York.

Dec. 28, 1979.

Supplemental Findings Jan. 22, 1980.

Brooks, Haidt, Haffner & Delahunty, by G. Thomas Delahunty, New York City, and Thomas S. Calder and John J. Cummins, Cincinnati, Ohio, for plaintiff.

Patterson, Belknap, Webb & Tyler, by Thomas C. Morrison, New York City, Michael J. Ryan, Jr., New Brunswick, New Jersey, and Christine H. Miller, New York City for defendants.

LEVAL, District Judge.

## I. Introduction.

This is an action for trademark infringement, false designation of origin, unfair competition and trademark dilution.[1] The plaintiff, Procter & Gamble Co. ("P&G"), an Ohio corporation, is one of the country's largest manufacturers of household and personal use products. The defendants are Johnson & Johnson Incorporated ("J&J") and its wholly-owned subsidiary Personal Products Company ("PPC"), both New Jersey corporations. PPC is the leading manufacturer of women's external menstrual protection products. The case raises interesting questions.

---

[1]. Plaintiff's claims for infringement are founded upon federal trademark law, which provides for injunctive relief and damages in the case of infringement of registered marks by the use of marks likely to cause confusion, mistake or deception in interstate commerce, 15 U.S.C. § 1114 et seq., and New York common law. Its claim for false designation of origin is founded upon § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The unfair competition claim derives from New York State common law. The dilution claim is based upon § 368-d of the New York General Business Law. This court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1338 and 15 U.S.C. § 1121.

The defendants' trademarks which are alleged to infringe rights of the plaintiff are "Assure!" as used on a woman's menstrual tampon, and "Sure & Natural", as used on an external menstrual protection shield.

The plaintiff's marks alleged to be infringed are "Sure" for an underarm antiperspirant deodorant and for a woman's tampon, and "Assure" for a mouthwash and a shampoo.

Plaintiff seeks damages and injunctive relief. Defendants deny plaintiff's allegations and seek an order directing the cancellation of P&G's registration of the Sure tampon and Assure mouthwash and shampoo trademarks.[2]

Trial consumed 16 days and was completed last Thursday, December 20. For reasons of commercial urgency, the parties have requested a speedy decision.

I congratulate counsel on both sides for careful preparation and skillful presentation of their contentions.

## II. *Facts.*

The history of the development of the controversy is as follows.

### a. *P&G'S Establishment of its Marks.*

In 1964 P&G acquired the trademark "Sure" for a personal deodorant from a prior owner. At the time P&G considered using the mark on two different products which it had in development. One was an anti-perspirant underarm deodorant which eventually entered test market in 1972 bearing the name "Sure" and which has since established itself as one of the best selling anti-perspirants in the country. The other was a woman's tampon which was to be P&G's first entry into the woman's sanitary protection field. Accordingly, P&G applied in 1964 for a federal trademark registration for "Sure" for tampons. As a deodorant mark, "Sure" was already registered by the predecessor.

P&G encountered clouds and potential obstacles to its use of the mark. Litigation with one adverse claimant was settled in 1968, following which the registration of "Sure" for tampons was granted by the patent office. In 1970, P&G succeeded in removing another potential cloud by buying from its owner the mark "Assure" which was registered for use on a mouthwash and a shampoo.

Also in 1970, P&G won a favorable resolution of a lawsuit brought by the manufacturer of a competing deodorant Arrid which sought to prevent P&G's use of "Sure" on the deodorant by reason of trademark rights in Arrid's advertising slogan "Use Arrid, to be sure". *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794 (9 Cir. 1970).

The anti-perspirant was ready for test marketing far in advance of the tampon. It was given the name Sure Anti-perspirant Deodorant and entered test market in 1972; it went national in 1973. Since it was introduced, over 300 million units have been sold bringing revenues to P&G of approximately $300,000,000. P&G has spent approximately $100,000,000 on the promotion of the product.

In 1974, P&G's tampon was ready to enter test market. The name Sure was not adopted. The name chosen was Rely. The marketing of Rely has expanded from year to year to the point that it is now sold in approximately two-thirds of the United States, including substantially all but the northeast.

Sure for tampons, since 1964, and Assure for mouthwash and shampoo, since 1970, have been carried by P&G in its "minor brands program". The minor brands program is designed by P&G to establish and maintain ownership rights over trademarks which have not been assigned by P&G to any commercially marketed product. One of the most hotly contested issues in this lawsuit is the legal effectiveness of this program to maintain ownership rights in the Assure and Sure-for-tampon marks for ten and sixteen years respectively.

---

**2.** This court is empowered to order such cancellations by virtue of 15 U.S.C. § 1119.

## b. *J&J's Establishment of its Marks.*

*Assure! Natural Fit Tampon.*

For many years J&J's subsidiary PPC has been the country's leading manufacturer of women's external sanitary protection devices which have included the brand names Modess, Carefree and Stayfree. Although there was at one time a Modess tampon, it was not commercially successful; PPC has never successfully marketed a tampon. The tampon market has for many years been dominated by Tampax.

Since the early 1970's PPC has had under development a tampon, the subject of this lawsuit, which claims important technological improvements over prior products. The product development project was named Apex. The tampon eventually acquired the name Assure! Natural Fit Tampon. The principal technological improvements claimed have to do with high absorbency fibres and radial expansion. (The Tampax tampon expands in length, rather than radius, as it absorbs fluid). The Assure tampon also carries a deodorancy feature consisting of a masking fragrance, which was added to the product in 1976. During the 1970's other tampons have been introduced which involve the use of highly absorbent fibres and radial expansion; these include P&G's Rely, and Playtex. PPC's parent J&J markets a radially expanding tampon under the name "o.b." PPC claims superiority to its competitors' products on the grounds that while the competitors' expand outward only at the upper end, Assure expends radially throughout its length assuring a better fit, better protection against leakage and greater comfort. Assure, Rely and Playtex are expected to compete with one another to seek to take away from Tampax a share of its market dominance.

During the mid-1970's PPC searched extensively for an appropriate name for its product. Hundreds of names were considered and nearly twenty were tested for consumer reaction by market research specialists. PPC was interested in a name which would evoke confidence in the additional protection against leakage offered by the radial expansion technology. It was impressed with the name Rely which P&G had chosen for similar reasons.

The name Assure was first considered in 1974. A Miss Aikman, who was then in charge of the product's development at PPC, requested the office of legal counsel to ascertain the availability of the name. In response Michael J. Ryan, trademark counsel of J&J, commissioned a search of the trademark register. The trademark search revealed the existence of P&G's registration of the Sure mark for tampons as well as Sure for deodorant. On this basis Ryan furnished a standard-form provisional opinion stating that Assure "appears to be not available and registerable at this date." This was one of hundreds of routine requests of this nature handled annually by Ryan's office. It was one of many such requests emanating from the Apex project. Ryan's opinion was provisional and qualified by the word "appears". It was based solely on the face of the trademark register. Aikman apparently was aware of the existence of P&G's minor brand Sure tampon, as a packet of Sure tampons was found in her credenza by her successor.

In 1974 Mary McGuire took over responsibility for the development of the Apex Project at PPC. Consumer testing of the product at that time convinced McGuire that it was not ready for market. PPC had no prior experience with the use of superabsorbent fibres. The product did not work satisfactorily. Accordingly she directed her attention for nearly two years to the improvement of the technology. The process was expensive, laborious and time-consuming. When the product had been substantially improved, it was tested for consumer preference against Playtex's radially expending deodorant tampon. The testing indicated that consumers favored a product carrying a fragrance. Accordingly, a fragrance was added to PPC's tampon. During McGuire's first two years on the project, little attention was given to the problem of naming as her primary attention was focussed on product improvement.

In the second half of 1976 attention returned to the naming problem. A large

number of names was under consideration and many were submitted to Ryan for a routine check of the trademark register. Among them once again was the name Assure, no one remembering that it had been checked in 1974. Ryan again commissioned a trademark search. He delivered a second tentative opinion again stating the conclusion that the name appeared to be unavailable based on P&G registrations for Sure tampons and Assure shampoo.

In the fall of 1976 PPC conducted extensive name testing among consumers. The name "Assurance Plus" tested extremely well. Furthermore, it carried connotations which McGuire and her superiors considered desirable for the product. McGuire did not like the name because it was too long. Attention returned to the name Assure.

P&G was not known to be marketing either a Sure tampon or any product under the Assure label. Accordingly, Ryan was instructed to investigate further the legal availability of the name to determine whether the P&G registrations represented marks which were actively used in commerce, or whether the marks might be available in spite of the registrations. Ryan conducted an investigation. First he instructed the PPC sales force to canvas retail stores throughout the country to determine whether a P&G Sure tampon or Assure shampoo was being marketed. No such products were found in existence. Ryan also commissioned an outside investigator to explore the question. This was a Mr. John Sersen on whom J&J's legal department frequently relied for such investigations. Sersen reported back that P&G's marketing personnel were unaware of the existence of such products. On the basis of the information available to him Ryan advised PPC's executives that the P&G registrations were no legal obstacle to PPC since P&G had not used the marks in commerce. He also concluded that P&G's use of Sure on an underarm anti-perspirant deodorant would not bar PPC's use of Assure on a tampon because of differences in the name and in the product categories. Ryan furnished his opinion to PPC's executives that the name Assure was legally available.

In January, 1977 PPC made initial token sales under an Assure label in order to qualify for registration. Subsequently, PPC filed an application to the Patent and Trademark Office of the U.S. Department of Commerce seeking to register the mark Assure for tampons. Not surprisingly, registration was refused on December 29, 1977 by reason of the P&G registration of Sure for tampons.

1977 and the early part of 1978 were devoted primarily to the development of an advertising strategy and copy. For a long time this endeavor did not fare well. PPC's agency was SSC&B. The approach which the agency developed initially was called the three-in-one approach. It told the consumer of three significant benefits to be derived from the product—protection, comfort and deodorancy. An obstacle to the use of this strategy lay in the rules of the National Association of Broadcasters Code. The Code authorities prohibit any reference to the deodorant qualities of the tampon except insofar as such reference is part of the product's name. Thus, in order to permit television advertising of the three benefits approach, the name was modified to Assure! Deodorant Tampons.

The three-in-one advertising strategy was too diffuse and was not successful in testing. PPC continued to search for an advertising strategy. In 1978 PPC sought a fresh start consulting two other agencies. One of them suggested a completely new product name—"Woman". But the Woman strategy failed to convey the benefits of the product and did not do well in consumer testing.

Eventually McGuire and her SSC&B team decided to focus on the most significant and unique benefit of the product, the radial expansion throughout its length, which permits it to adapt its shape to the shape of the vagina. This was thought to provide greater comfort and protection. This feature was demonstrated by placing tampons in variously shaped water glasses; in each case the tampon assumed the shape of the container, in a manner that permit-

ted the container to be turned over without the water leaking out. From these discussions emerged the "It fits" strategy incorporating a three vial photographic display of the radial expansion. Print ads based on this concept tested extremely favorably. The development of television advertising faced another obstacle. The ever-vigilant NAB Code also forbids any reference to the fit of a tampon except as part of the product's name. Accordingly, the word deodorant was dropped from the name and instead the name became Assure! Natural Fit tampons. The television copy prepared on this theme also tested very well. It was markedly superior to the suggestions and copy submitted by the other two advertising firms consulted. These were dropped. The "It fits" strategy was adopted. Final advertising was prepared and the product was finally named Assure! Natural Fit tampons.

The Assure tampon entered test market in Rochester in October, 1978 and in Portland in January, 1979. The test marketing was supported by the "It fits" print and television advertising. The print ads, which carry extensive copy, contain a mention of deodorancy, but it is given minimal importance in the overall impact of the ads. The television commercials, under the strictures of the NAB Code, contain no reference whatever to deodorancy, except that the package is visible on the screen with the word "deodorant" written on a corner of it. These advertising campaigns and the product sales have been successful. Second generation advertising has been developed to be used as follow-up in those markets. In the second generation advertising the deodorancy feature has been further diminished in importance.

Throughout the history of the Assure name selection and advertising strategy development there is no indication of any intention to trade on any association with P&G's Sure anti-perspirant trademark.

*Sure & Natural Maxishields.*

In 1977, in Europe, the Unilever interests began marketing of a revolutionary new external menstrual protection device which, using super absorbent synthetic fibres, offered sufficient absorbency to contain the menstrual flow in a pad which was markedly thinner, less bulky and correspondingly more comfortable than any predecessor on the market. Several competitors including PPC then developed competing technology and were soon offering comparable products on the European markets. PPC believes it is in a race with others, including P&G, to develop such a product for entry in the United States market.

As mentioned above PPC has for many years been the leader in manufacture of external protection devices. Its current leading product for full menstrual flow was the Stayfree Maxi-pad. These are approximately three quarters of an inch thick. The box in which they are sold is large and bulky. PPC's new product is only ¼ inch thick and is believed to be capable of absorbing full menstrual flow. Because the product is so thin, it is enormously more comfortable than the bulky pads which were previously required during heavy flow.

After extensive consumer testing, the word "maxishields" was chosen as a generic descriptive to be a part of the product's name. This was a cross between the names of the absorbent maxi-pad and a thin "panty shield" which PPC sold under the name "Carefree" for protection against between-period spotting.

In early 1978 PPC began to search for a brand name which would communicate the product's novel and important benefits. At first it employed the services of Brand Group, Inc., a computer name search organization, which submitted thousands of names for consideration. During 1978 extensive name-testing was performed among consumers. In the fall of 1978 the name Sure & Natural emerged as the clear winner of all testing. Ryan was consulted as to the availability of the name. Ryan advised based on considerations similar to those which governed his advice on the Assure name, that the name was legally available.

After P&G brought this action against the Assure name, the top executives and

general counsel of J&J reconsidered the question whether to go ahead with the Sure & Natural name. They decided on advice of counsel that P&G's claims posed no legal obstacle to PPC's use of the Sure & Natural name and that if sued by P&G PPC would be likely to prevail. A decision was made to continue with the Sure & Natural name.

During 1979 PPC has spent close to $5,000,000 on the preparation of packaging and advertising for the sale of Sure & Natural Maxishields. Print ads have been prepared as well as advertisements for television. Once again suitable advertising was obtained only with great difficulty. It took over a year to develop satisfactory copy.

Packaging was an enormous undertaking. PPC worked with six different packaging houses and considered literally thousands of mock up packages.

Sure & Natural Maxishields do not contain any fragrance or deodorancy feature. PPC did not consider adding a deodorant while the product was under development; it believes that the presence of a deodorant would draw attention away from the unique features of this product. While it is possible that PPC may add a fragrance or deodorancy feature to the product at some time in the future, no such plans have been considered to date and no consumer testing has been done to determine the implications of such a change.

Test marketing began in Florida in December during this trial. When P&G learned during trial of the Sure & Natural Maxishield, the proceedings were interrupted for further discovery and P&G modified its complaint to include claims directed against this mark as well as Assure.

Because of the revolutionary nature of this product and the commercial importance of being first to launch such a product on the U.S. market, PPC is making every effort to begin full scale national distribution at the earliest possible date. It will not engage in drawn out test marketing procedures as it has in the case of the Assure tampon.

The parties have stipulated that it may be assumed for purposes of the action (although not necessarily based on fact) that P&G is in a race with PPC to be the first to market a similar thin super-absorbent pad and that a significant competitive advantage will accrue to the first to reach national distribution.

Nothing in the evidence suggests any intention on J&J's part to imitate or trade in any way on the name or reputation of P&G's Sure anti-perspirant deodorant.

*PPC's Cancellation Proceeding in the Patent Office.*

In early 1978 Ryan communicated with John J. Cummins, his counterpart at P&G in the hopes of obtaining a waiver of any claim of infringement of P&G's minor brands. The discussions were not successful. Recognizing that the Assure mark could not be registered in the patent office unless the obstacle of P&G's Sure for tampons was removed, Ryan determined that it was necessary to institute a cancellation proceeding in the patent office in which he would demonstrate that P&G had abandoned the mark by reason of its non-use since registration in 1968. The proceeding was initiated before the Trademark Trial and Appeal Board in June of 1978. In due course P&G answered. A schedule was set for the submission of proofs which called for the filing of PPC's submissions by March 5, 1979. In the meantime Ryan approached Cummins in a further attempt to settle amicably. They concluded that the matter would have to be resolved in the district court. In October, 1978 as stated above PPC began its test marketing of the Assure! Natural Fit tampon in Rochester. On November 22, 1978 P&G filed this action.

Upon P&G's institution of this action, Ryan took no further steps to prosecute the proceeding before the Board believing that the entire controversy would be consolidated into this district court litigation. He knew that the clerk of the district court is required by law to notify the patent office of the filing of the complaint. Ryan testified that it was the conventional practice

among patent attorneys in these common circumstances where the respondent in a cancellation proceeding has filed an infringement action in the district court, for that party to advise the Board that the patent office proceeding is suspended in view of the district court litigation.

Cummins did not so advise the patent office. Instead on March 8, 1979, three days after the time set by the Board for the submission of the plaintiff's proofs, he moved for a default judgment by reason of PPC's failure to prosecute the action. The motion was granted over PPC's opposition. PPC made repeated efforts to vacate this default which in each instance were denied. Finally on December 6, 1979 while this trial was in progress, the Commissioner of Patents issued a final opinion declining to review the Board's action. The Commissioner however granted an extension of 60 days for PPC to file a civil action for review in the United States District Court or to file an appeal with the Court of Customs and Patent Appeal. PPC thereafter modified its pleadings in this action to seek review of the dismissal by the Board.

### III. *The Contentions*

Plaintiff asserts that the Assure and the Sure & Natural marks infringe, compete unfairly with and dilute plaintiff's marks and that defendants' use of the marks would involve a false designation of origin.

Defendants contend insofar as plaintiff's claims are made on behalf of its Sure deodorant mark, that there is (1) no substantial likelihood of consumer confusion as to a common source of the products at issue; (2) no likelihood that P&G will use the Sure mark on a menstrual protection product; and (3) no threat to P&G's business reputation or to the strength of the Sure deodorant mark. Thus, defendants contend that no infringement, unfair competition, false designation of origin or unfair competition has been shown.

Insofar as plaintiff's claims are made on behalf of the minor brands, defendants contend that P&G has not established the right to trademark protection because it has not used the marks in commerce. Defendants seek an order directing the cancellation of these registrations.

I find that the defendants have thoroughly and convincingly demonstrated the validity of their contentions.

### (a) Infringement of the Sure Anti-perspirant Mark.

■ A long and consistent series of opinions in this Circuit has outlined the task of the district judge in determining when and to what extent a trademark owner can block another's use of the same or a similar mark on products different from his own. The universal reference point is Judge Friendly's opinion in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2nd Cir. 1961) in which he set forth eight relevant factors to be considered, these being: "the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers." In *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 536 (2d Cir. 1964) Judge Friendly noted another factor, the relative harm which the parties would experience as a result of grant or denial of the injunction.

These factors are designed to guide the court in guarding the three interests which justify trademark protection covering non-identical products: "[F]irst, the senior user's interest in being able to enter a related field at some future time; second, his interest in protecting the good reputation associated with his mark from the possibility of being tarnished by inferior merchandise of the junior user; and third, the public's interest in not being misled by confusingly similar marks . . ." *Scarves by Vera v. Todo Imports*, 544 F.2d 1167, 1172 (2d Cir. 1976). The consideration which the courts have repeatedly emphasized is— "[W]hether there is any likelihood that an appreciable number of ordinarily prudent

purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question," *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1130 (2d Cir. 1979); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2 Cir. 1978). The factors also give appropriate regard to equity and fair play.

I have given consideration to and hereinafter discuss each of these factors. I find that no interest protected by trademark laws would be served by allowing P&G's ownership of the Sure mark on its anti-perspirant to justify enjoining defendant's use of its marks.

*A. The Strength of P&G's Sure Mark.*

■ The strength of a trademark depends upon "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor-Doniger, supra* 599 F.2d at 1131. Trademarks are divided into four categories forming the spectrum of trademark strength, ranging from those trademarks so inherently weak as to receive no legal protection to those so strong as to command broad protection. E. g., *McGregor-Doniger, supra; Abercrombie & Fitch Co. v. Hunting World*, 537 F.2d 4 (2 Cir. 1976).

At the weakest end of the spectrum are the generic marks, which cannot be registered and receive no protection. At the strongest end are the arbitrary or fanciful marks. In between, are descriptive marks, on the weaker side, and suggestive marks on the stronger side.

■ Descriptive terms are those which "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods." *Abercrombie & Fitch, supra*, 537 F.2d at 11. They are entitled to registration as trademarks only upon proof that they have acquired "secondary meaning", or in other words, have become associated in the public mind with the product or its

source. Suggestive terms are those which "require[ ] imagination, thought and perception to reach a conclusion as to the nature of goods." Id. at 11. They can be registered without proof of secondary meaning.

■ When a registration was sought for Sure, the Patent and Trademark Office registered the mark without requiring proof of secondary meaning, apparently finding that it was suggestive rather than descriptive. The approval of the patent office established a rebuttable presumption that the mark is suggestive. *See Abercrombie & Fitch, supra*, 537 F.2d at 11. I do not disturb the patent office finding.

■ However, I find that the Sure deodorant mark is intrinsically very weak, falling in the weakest end of the suggestive range. It is not very distinctive; its identifying or "origin-indicating" capacities are very low. *McGregor-Doniger, supra.*

As a name for an anti-perspirant deodorant Sure lacks originality and uniqueness. P&G has used one of the most common adjectives in the English language accurately spelled to boot, to convey, through that word's primary meaning, a quality of the product or of a promised consumer reaction to its use.[3] The mark promises that users can be "sure" that their product will perform satisfactorily. They can be "sure" in the sense of the confidence that it will give them of protection from embarrassment.

In some respects, the Sure mark shares the features of laudatory marks like "best", "outstanding" or "supreme", which are entitled to little or no protection. E. g., *Supreme Wine Company v. American Distilling Company*, 310 F.2d 888 (2d Cir. 1962); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403 (S.D.N.Y.1974).

The extent to which sure is used in advertising deodorant and other products is fur-

---

**3.** An expert in linguistics testified that two leading studies of use frequency showed "sure" to be the 268th or 350th most commonly used word in the English language.

ther evidence of the inherent weakness of the mark.[4] P&G itself uses the word *sure* throughout its advertising. Indeed, in order to establish its right to the Sure trademark, P&G had to defeat Carter Wallace's claim that its slogan "Use Arrid to be sure" entitled Carter Wallace to exclusive rights. Underlying the Ninth Circuit's decision in P&G's favor was its finding that *sure* is a common word frequently utilized in advertising by manufacturers of deodorants and kindred products. *Carter-Wallace*, 434 F.2d at at 801–2. That decision should certainly have put P&G on notice that Sure as applied to a deodorant product would be an unoriginal, non-distinctive and weak mark.

Of course the inquiry into strength does not end with a characterization of a mark's inherent distinctiveness. Marks not originally strong can acquire strength by developing secondary meaning. In other words, the law recognizes that marks which are not inherently distinctive can become distinctive through use, as the public comes to associate the mark with the product or source.

P&G has presented evidence of very large sales and advertising expenditures connected with Sure deodorant. It has sold some 300 million units in the last seven years and spent $100 million in the promotion of the name. I do not question that Sure has acquired some significant secondary meaning and strength. Nonetheless, the more common the word and the more commonplace the manner of its usage in a trademark, the more difficult it is to displace the word's conventional significance so that it will be associated primarily in the public eye with the product. I have given P&G full recognition and credit for having established a secondary meaning and popular association through its marketing and promotion of Sure Anti-perspirant Deodorant. I nonetheless find that its strength is at best moderate.

**4.** Defendant introduced patent office registrations of over 200 marks using some form of the word sure. While these registrations are not here considered as evidence of the extent of use

### B. The Degree of Similarity Between the Marks.

Similarity, for these purposes, is a functional test which must take in "all the factors that could reasonably be expected to be perceived by and remembered by potential purchasers" to determine whether it "is likely to provoke confusion." *McGregor-Doniger*, 599 F.2d at 1133, 3 Callmann, The Law of Unfair Competition Trademarks and Monopolies, § 82.1(a) at 601–02 (3rd ed. 1969). The court must consider both the similarity of the names and the manner of their presentation to the public to determine whether confusion is likely to result.

While there is unquestionably a similarity between the words in question, a complete analysis shows that no confusion is likely.

First of all the character of the marks must be considered. When arbitrary or fanciful marks are involved, the distinctiveness of the marks will make the public more conscious of similarities than differences. As the district court noted in *E.I. Dupont de Nemours and Co. v. Yoshida Int'l Inc.*, 393 F.Supp. 502 (E.D.N.Y.1975), where close similarity was found to exist between Teflon and Eflon marks, "use of similar coined words renders confusion more likely." 393 F.Supp. at 511. In contrast when common words are involved as they are here, the degree of difference rather than the degree of similarity is likely to be more noticeable. In this light it is notable that the word assure is a verb, whereas sure is most commonly an adjective. As such it is necessarily used in a different fashion and produces different associations. It is also worth noting that the Assure! mark includes an exclamation point and double the number of syllables.

In like manner "Sure & Natural" is a combination of three words—two equally weighed adjectives separated by an ampersand. It is significantly and noticeably different from *sure*. This is not a case where

in commerce or of dilution of P&G's mark, see *Scarves by Vera, supra*, 544 F.2d at 1173, they do shed some minimal light on the degree of originality inherent in the Sure mark.

a "plus" or "II" or "new" has been added to a distinctive mark in a manner which the consumer might expect to represent a line extension. *Sure* is a common word and is not the dominant or distinctive element of "Sure & Natural". It is simply one of two common adjectives equally balanced and presented in combination.

In short, without denying the existence of a significant root similarity, the differences are marked, and prominent. Further whatever similarities exist between the marks is thoroughly undermined by the difference in visual presentation.

Neither the packaging nor the presentation of the brand names look at all alike. The basic color of the Sure Anti-perspirant container is white; the word "Sure" is written in upright uniform caps going diagonally across the upper part of the container, the name bordered above and below by bold diagonal colored stripes. The color contrasts are strong. There are no pictures or distractive images on the packaging.

Assure is packed quite differently, in large rectangular boxes. The coloring is a uniform pastel of green, yellow or orange, with a delicate butterfly in darker shades of the same color on the panel. The word *Assure* is written in a slightly inclined italic, a large capital A followed by smaller lower case letters and a slanted exclamation point at the end. The package contains design suggestions of delicacy and femininity which are totally absent from Sure's presentation.

The Sure & Natural package has a pale orange and yellow background with daisies on the lower corner. The brand name is written with initial caps and smaller lower case letters horizontally across the top of the package. Again, its impact and appearance have little in common with Sure's packaging or presentation.

PPC devoted great care and expense to the package design. Hundreds of designs were considered and many were tested for consumer preference. Considering overall

impact, the defendant's packaging is in no way suggestive or reminiscent of plaintiff's.

In conclusion I find that the similarities between plaintiff's and defendant's marks are not confusing, that the dissimilarities are prominent and noticeable, and upon total consideration of the similarities and dissimilarities I find little likelihood that the defendant's products will be associated in the consumers' minds with the plaintiff or its product.

### C. Proximity of the Products.

■ The proximity of the products factor does not favor the defendants as strongly as the other factors to be considered. Both are personal body care products aimed primarily at avoiding embarrassing stains on garments; Assure and Sure share a deodorancy feature. They sell for approximately similar prices. They are sold in the same types of outlets and they are advertised in generally similar fashion in magazines and on television. A consumer might expect a single manufacturer to make both products; indeed P&G does.[5]

On the other hand, there is competitive distance between the products. Women's menstrual protection products (or "catamenials" as they are sometimes called in the industry) are generally regarded as a separate class of consumer products. While the two types of products are sold in the same outlets, they are not sold side by side or on the same shelf. In drug stores, supermarkets and discount houses, deodorants have one shelving section and women's menstrual protection products another. *See* 3 Callmann § 82.2(c)(2); *King Research, Inc. v. Shulton, Inc.*, 324 F.Supp. 631, 638 (D.C. N.Y.) *aff'd*, 454 F.2d 66 (2 Cir. 1972). Further, the deodorancy feature of the products is significantly different: The Sure deodorant operates primarily through antiperspirant and a chemical killing of odor-causing bacteria; the deodorant contained in the tampon is a masking fragrance. In

---

**5.** In fact the manufacturing process for tampons is complicated and very different from deodorants. As to this inquiry, however, the truth is less important than the consumer's perception.

neither case is the deodorancy feature emphasized in marketing. Sure is positioned on the market primarily as an anti-perspirant. Its advertising promises dryness and confidence derived from the anti-perspirant qualities of the product; deodorancy is an unstressed secondary feature. As explained above, Assure does not highlight the deodorancy feature in its advertising. Its strategy is directed towards the comfort, fit and the consequent reliability of the product. In television advertising the deodorancy is not mentioned at all (except to the extent that the word "deodorant" can be perceived on the package). Print advertising does include claims of deodorancy, but these are secondary to the other claims.

I conclude that the products are sufficiently close that a reasonable possibility of public confusion could exist if other factors were present to support it. However, having found no such factors leading to confusion or mistaken association, the proximity of the products is of little significance.

### D. The Likelihood that P&G will Bridge the Gap.

█ The likelihood of P&G's bridging the gap by marketing a tampon or other catamenial product under the name Sure was one of the most hotly contested issues in this litigation. Since at least 1968 (and possibly as early as 1964), P&G has engaged in a token distribution of tampons under the Sure mark in accordance with the procedures of its Minor Brands program. Several of P&G's executives testified that they continued to regard Sure as a likely name for a future tampon product. They said it had not been given to P&G's first tampon because in 1974 when the tampon was named, the Sure deodorant name was not yet sufficiently established on the market; it would have been too risky to launch two major products with an unestablished name. Now that Sure anti-perspirant has established itself as a major brand, they argue that the same name can be used on the tampon without unreasonable risk. Indeed, they testified it was a likely candidate.

On consideration of all of the evidence, I find it extremely unlikely that P&G will bridge the gap by using the Sure name on a tampon product. To do so would be markedly inconsistent with P&G's traditional approach to the naming of products and to the administration of brands. Furthermore, the testimony of P&G's own executives reveal that so naming a tampon would involve risks to the marketing of Sure anti-perspirant which P&G could not easily justify taking.

P&G testified that its business was operated under the theory of brand management. Each of P&G's brands stands as an independent self-sustaining competitive unit; some even compete with one another. The Procter & Gamble origin is minimized. On each of its products the brand name is prominently displayed while the name of Procter & Gamble is generally shown only on an obscure part of the package in very small type in such a manner that it will not be noticed without a careful examination. The Procter & Gamble name is not used in advertising except on occasion to give new products a boost upon their introduction. The policy is that each brand must have the strength to stand independently and firmly on its own. To the extent that any brand becomes the victim of adverse publicity, the damage will be limited to that brand and will not spill over to the company's other brands. These business policies are inconsistent with extending the Sure name from the anti-perspirant to a tampon.

The tampon would be manufactured, promoted and sold in a separate division from that which manufactures and controls the publicity for the deodorant: the deodorant is sold by the toilet goods division: the tampon would come from the paper goods division. The advertising and brand promotion personnel of these two divisions operate separately and independently from each other. They do not work together, meet or interact except to the extent that they are under common supervision at the highest levels of the company. Thus the internal structure of P&G is not easily compatible with a rationalized, harmonious brand management covering both a deodorant and a tampon.

The defendants point to testimony of Howard Margens, former chairman of the P&G executive committee, in another trial in 1975 to the effect that "with rare exception we don't use . . . the name of one brand on a second product." Although P&G witnesses claimed that there was no such company policy, they were not able to point to a single convicting example of departure from the practice in the company's history. It is true the Ivory name had been used on a soap, a detergent and a shampoo. While there may be significant chemical differences between these products, they are very closely associated in the minds of the consumer. Another example offered was the marketing of a liquid shampoo and a concentrate shampoo both under the name Prell. Again, these two products are so closely related as to appear to be one. Other instances were infrequent and unconvincing.

Finally, P&G's executives testified to serious harm which could be caused to its deodorant market by use of the Sure name on feminine sanitary protection products. Indeed, this is the basis of a large part of P&G's claim concerning the potential harm threatened by the defendant's use of a name similar to Sure on a tampon. P&G has made a point in positioning its Sure anti-perspirant to appeal to the entire family, male and female. Previously, it had marketed a Secret deodorant which was aimed at a female market. A competing deodorant product is Right Guard which aims primarily at a male clientele. P&G testified that if the name Sure were to become associated with a menstrual product, such as the Assure tampon, this would have an adverse impact on its male clientele for the Sure deodorant. For this reason the manager of the toilet goods division conceded that his division would be opposed to giving the Sure name to a tampon at P&G, though he argued that his opposition would be overruled if his superiors thought such action was in the best interests of the company.

P&G did not use the Sure name on its first tampon introduced in 1974. Although it has four additional catamenial products under development, the Sure name has not been provisionally assigned to any of them. I conclude that the likelihood of P&G's bridging the gap by using Sure as a tampon is insignificant or non-existent.

## E. Actual Confusion.

For a year the Assure tampon has been actively sold in test markets in Rochester and the Portland area. Despite this fact P&G has produced no single instance of consumer confusion. For approximately three years PPC has been heavily engaged in consumer testing of advertising utilizing the Assure name for tampons. This testing has involved the recording of one to two thousand verbatim consumer reactions to the advertising copy. P&G is able to point to no convincing examples of confusion from any of this. In two instances of testing of television advertising, a consumer stated that at first she thought it was Sure but immediately recognized her mistake because Sure was a deodorant and this was a different product with a different name. If this evidenced confusion at all it was only momentary and numerically insignificant.

Plaintiff's expert Longman offered testimony that his analysis of the defendant's consumer testing revealed the presence of unconscious confusion. He offered two examples from hundreds in which viewers had "played back" a deodorancy message from a television commercial which did not contain a deodorancy message and attributed this to unconscious association with the Sure deodorant. He conceded on cross-examination that the commercial in question did contain a reference to deodorancy in that the Assure box was displayed throughout the commercial with the word "deodorant" printed on its face. And even if the recollection of deodorancy had not been traceable to any content of the advertisement, it is no more likely that the gratuitous reference resulted from association with Sure deodorant than from association with a competing deodorant tampon or, as defendant's product manager testified, from a common feminine concern about odors from menstruation. Longman's arguments were imaginative,

but depended upon a strained, argumentative and unconvincing logic. Furthermore, the instances he offered as evidence of confusion were numerically insignificant.

The absence of evidence of actual confusion given the extensive consumer testing conducted by PPC and the full scale test marketing for over a year in cities constituting 1½% of the U.S. population, suggests that confusion is unlikely to occur in the future.[6]

### F. Defendant's Good Faith in Adopting its Mark.

■ There is no suggestion that the defendant is seeking to capitalize on goodwill obtained by the plaintiff through the use of its Sure mark or to obtain any kind of a free ride. The defendant does not seek to benefit from any confusion between its products and those of plaintiff. I find that PPC believes, in good faith and for good reason, that no such confusion will occur.

The defendant, like the plaintiff, is a substantial and respected company. Both companies have achieved their success by the marketing of quality products. The defendant has expended over fifteen million dollars on the development of its two products. It has spent nearly ten million dollars on name selection, packaging, generation of publicity, consumer testing and promotion. The selection of the names in controversy resulted from very extensive lengthy consumer testing and research during which hundreds of names were considered and many were tested. Defendant plans enormous expenditures in publicizing and promoting the products. These facts indicate that the defendant is relying on its own quality and publicity, and not on the plaintiff's.

6. PPC offered evidence that P&G had commissioned a confusion survey. PPC asks the court to draw an inference adverse to P&G by reason of its failure to produce the survey. I have declined to consider this as a factor because of doubts as to whether even the fact of such expert testing should be admissible when offered by the adversary. See Rule 26(b)(4)(B), F.R.Civ.P. (P&G did not object to the questions which elicited the fact of the test. It did object to a demand for the production of the test, which objection was sustained.)

Furthermore, just as plaintiff's witnesses argue that an association of tampons with the Sure deodorant might be harmful to the sales of the Sure deodorant, defendant's witnesses are equally convincing in asserting that the marketing of its products could be damaged by public association with Sure anti-perspirant, if such association existed. Sure anti-perspirant functions through strong chemicals (aluminum chlorohydrate and zirconium) which inhibit underarm secretions and cause dryness. Association of such strong chemical action with a tampon would cause extremely unfavorable consumer reaction. PPC is proceeding with its brands because it is confident that no such association with P&G's anti-perspirant will occur. There is no suggestion in the history of defendant's selection of its marks set out above that it was motivated by anything but legitimate competitive considerations unrelated to the existence of plaintiff's marks.

■ It is true of course that the defendant was aware of the plaintiff's claims and, after an unsuccessful attempt to purchase P&G's rights, chose to disregard them. This does not mean that the defendant acted in bad faith. This Circuit has clearly held that good faith can be found even when the junior user has both actual and constructive notice of the senior user's mark. *Mushroom Makers, supra,* 580 F.2d at 48. Prior use of a trademark does not necessarily give the user the right to block its subsequent use. *Federal Telephone & Radio Corp. v. Federal Television Corp.,* 180 F.2d 250, 251 (2 Cir. 1950) (Hand, J.) This is of course even clearer when significantly dissimilar marks are at issue.

PPC also argues that an inference should be drawn against P&G by reason of its failure generally to offer evidence of a confusion survey. However, the opportunity was available equally to PPC to commission and offer such a survey. An inference thus may be drawn against PPC as well.

For these reasons, I have given no significance or weight whatever to this issue.

The defendant's actions were taken only after careful consideration led it to conclude that the plaintiff possessed no adverse rights. PPC concluded, and correctly in my view, that since there was no likelihood of confusion between its products and Sure anti-perspirant deodorant, P&G's ownership of the Sure mark constituted no obstacle to its marketing plans. PPC further concluded, and again correctly in my judgment, that P&G owned no rights in Sure for tampons or Assure for mouth wash and deodorant. Accordingly, there was no reason in the world involving either ethics or respect for law which should have inhibited the defendant from going ahead. To have taken these names in the face of P&G's known claims may have been an act of boldness, but it was not an act of bad faith.

A second aspect of P&G's contentions which relates to both the likelihood of confusion and the issue of good faith is the contention that PPC has reduced its emphasis of deodorancy in Assure by reason of the lawsuit and is likely to re-emphasize that benefit when the cloud has passed. I find no such likelihood.

While PPC and its advertising agencies were searching for a forceful advertising strategy, they considered the "3 benefits" approach. Of the three, deodorancy was mentioned last in all copy. For a time, the product was named Assure! Deodorant Tampons because of the NAB Code restrictions noted above. But testing showed that this was not a successful advertising strategy. It was dropped.

The advertising was changed to the "It fits" strategy, which immediately tested well. The product name was changed to Assure! Natural Fit Tampons and extensive advertising was prepared at enormous expense. The test markets were launched in Rochester and Portland based on this strategy and they have fared well. While print ads continue to contain a reference to deodorancy near the end of the lengthy copy, this claim is unquestionably subordinate in importance in the ad presentation. Television ads do not contain any such reference except to the extent that the word "deodorant" appears on the package exhibited.

I have no doubt that the shift away from deodorancy was in good faith and unrelated to this lawsuit. While it is difficult to predict the future, there is little evidence suggesting that PPC will move towards a deodorancy emphasis. It is a bad marketing strategy, according to witnesses on both sides, to make significant changes in the way a product is presented to the public. In any event, for reasons explained elsewhere in this opinion, consumer confusion would not be likely even if deodorancy were more strongly emphasized in the Assure promotion.

Sure & Natural Maxishields contain no deodorant. All the marketing emphasis goes to the technological improvement and consequent comfort of the product. It is possible, of course, that some day a deodorant might be added, or offered in a variant form. That possibility does not affect any conclusions in this opinion.

### G. The Quality of the Defendant's Product.

 This factor reflects the law's recognition that a prior owner should not be subjected to the risk that the public perception of his product will suffer if it is associated with a product of inferior quality. No such risk exists in this case. P&G's executives testified that the defendant had always marketed products of the highest quality and that there was no reason to doubt that they would do so in this case.

P&G raises the spectre that Sure could be harmed if, for example, Assure's deodorant proved to present a health risk. First, this is sheer speculation. That might not be sufficient answer if a likelihood of confusion existed. Since in my view it does not, even such adverse developments in PPC's products will have no influence on Sure anti-perspirant's market.

### H. The Sophistication of Buyers.

 The sophistication of buyers is relevant to likelihood that confusion will occur.

Of course the purchasers of women's sanitary protection products and of deodorants cover the entire range of American society and are clearly not limited to a sophisticated group. However, at least as to the purchasers of menstrual protection products, it was shown that women devote a high degree of care and attention to the selection of such products. They select them with careful attention to comfort, fit, applicators, presence or absence of deodorancy, and absorbency. This exercise of care further reduces the risk of confusion.

*I.* *Relative Harm Resulting to Plaintiff and Defendant from the Grant or Withholding of an Injunction.*

██ I have concluded that Sure antiperspirant deodorant will suffer no harm as a result of denial of the injunction sought here. I find no likelihood of consumer confusion, and no likelihood that Sure anti-perspirant will be harmed in any way by PPC advancing with the marketing of Assure! Natural Fit Tampons and Sure & Natural Maxishields. By reason of my finding no likelihood that P&G would bridge the gap carrying the Sure name over to a catamenial product, P&G suffers no harm by losing the opportunity to use the name Sure for such products. The only harm which P&G may suffer is in its marketing of the Rely tampon. · It is expected that the Rely tampon and the Assure! Natural Fit tampon will be formidable competitors for substantial shares of the tampon market. Rely enjoys a substantial advantage, in being closest to national marketing. There is no question it would gain further advantage if Assure were set back a year or more in its development by the loss of its name. But · this is not an interest which is entitled to recognition. The relative harm factor as applied to P&G is concerned only with its use of its Sure mark and not with advantages to be gained or lost in another field of competition.[7]

The harm which would accrue to PPC from a grant of an injunction would be very substantial. It is difficult to measure how long it would take for PPC to recover. It would need to re-enter consumer testing to find new names for both products and new advertisements. Defendant's evidence on this subject showed convincingly that it would take 1½ years at least for PPC to return to its present position. Indeed, if in the interim the competition made technological advances, PPC might be unable to re-enter without itself making further technological improvements. The balancing of the equities clearly favors the defendant.

██ P&G argues that PPC is itself responsible for whatever harms it may suffer since it could have avoided this by choosing different names which were clear of infringement claims. Accordingly, it argues in the balancing of equities PPC should receive no credit for a predicament it should have avoided. This argument might have some force if PPC had acted in arrogant or reckless disregard of P&G's rights. But that was not the case. PPC adopted the names only after investigation and evaluation convinced it that P&G held no preclusive rights. Seen in this context, P&G's argument would mean that, on pain of losing equitable credits, one must knuckle under the the unjustified threats of an adversary. I reject the argument.

*(b) P&G's Minor Brands.*

P&G's action is premised in part upon its registered ownership of the brands Sure for tampons and Assure for mouthwash and deodorant. PPC rebuts this part of plaintiff's claim by contending that P&G owns no rights in these marks, having failed to utilize them in commerce. In language of the Supreme Court dating from 1916:

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a

---

7. The same observations apply to the hypothetical stipulation positing (for purposes of this trial) that P&G is in a race to beat the Sure & Natural Maxishield to market, and that a significant competitive advantage will accrue to the first to achieve national distribution.

1204

part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business."

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 51, 63 L.Ed. 141 (1918); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916).

The defendant relies on Judge Friendly's landmark opinion in *La Societe Anonyme des Parfums Le Galion v. Jean Patou, Inc.*, 495 F.2d 1265 (2 Cir. 1974) (the "Snob" case) to the effect that usage which is sporadic, nominal and intended solely for trademark maintenance is insufficient to establish and maintain trademark rights.

 Broad statements of principle, however, will not answer for a particular case since "[d]etermining what constitutes sufficient use . . . [is] a case-by-case task . . . [and] the balance of the equities plays an important role in deciding whether defendant's use is sufficient . . . ." *Snob*, 495 F.2d at 1274 n. 11; *Pab Produits v. Satinine Societa*, 570 F.2d 328, 334 (C.C.P.A.1978). Upon detailed review of all the pertinent facts, I have concluded that P&G does not own a protectable interest in the marks in question.

Most of the facts here are not in dispute, although there is some dispute concerning P&G's intentions and motives.

 For many years P&G has maintained a formal program for the purpose of protecting its ownership rights in brand names which were not being actively used in commerce on its products. This program was entitled the "Minor Brands Program". In 1974 P&G's office of legal counsel circulated a memorandum institutionalizing the procedures to be followed for this brand maintenance program. The memorandum was revised in 1976 and was received in

evidence at the trial. (Exhibit D–74) The memorandum begins by stating that the failure to use a trademark for two consecutive years may result in its loss. "The Minor Brands Sales Program is intended", it states, "to rebut any such inference of abandonment and thus maintain the company's ability to subsequently use the marks on goods in question as major brands." The memorandum directs that the trademark section of the legal division will annually prepare a list of every mark owned by the company. The list will be divided into three categories, to be designated as Major Brand, Minor Brand and No Value. A major brand is one which is currently marketed on a day to day basis. "A 'No Value' mark is one in which there is no current commercial interest . . . All others automatically fall into the Minor Brand category." The memorandum goes on to state that each year the list will be reviewed with each division. "A diligent assessment will be made each year to place any marks which are in the Minor Brand category but which are unlikely to be selected for Major Brand usage within a reasonable period of time into the No Value category so as to keep Minor Brands to a minimum." The memorandum further instructs that when the list of minor brands has been reviewed each year, the trademark coordinator will pack 50 units of each product in the Minor Brand category and ship the 50 units to at least 10 states with a recommendation of alternation of states in succeeding years so as to achieve wide distribution. The shipments are made to normal customers for each type of product.

The evidence showed that the system functioned as follows. The distribution of goods in the Minor Brands Program is not handled by persons normally involved in P&G's merchandising operation. Indeed few employees at any level of P&G are even aware of the minor brands' existence. In each division of the company, one employee is charged with the distribution of minor brands. This "Minor Brands Coordinator" causes labels to be made and simple packages to be prepared for each minor brand. He then ships in accordance with

the standing written instructions from trademark counsel. For all items in the Minor Brands Program regardless of size, cost or any other feature, the price billed is $2 per case.

As there are no products of P&G covered by these minor brands, the coordinator takes some other P&G product in the brand category to be shipped under the minor brand's label. P&G's Prell Shampoo is bottled under 13 different minor brand labels for annual shipment at $2 a case. P&G's Scope Mouthwash is bottled under 7 different minor brand labels for annual shipment. The situation as to tampons is particularly curious. Prior to 1974 when Rely was introduced, P&G had no such product. Accordingly, it was the practice to buy the tampons of other manufacturers and to repackage them under P&G's various minor brand tampon labels. PPC learned through documents produced at the trial that in the 1960's, its own Modess tampons had been purchased by P&G and repackaged and shipped under a "Sure" Tampon label. In recent years for its minor brand tampons, P&G has been purchasing and shipping Tampax. Although since 1974 P&G has had a tampon product of its own, the Minor Brands Coordinator for the paper goods division has continued to ship Tampax rather than P&G's own product, apparently through oversight.

None of P&G's catalogues, price lists or other published materials make any reference to the minor brands. Indeed it appears that virtually none of P&G's personnel is aware of their existence. No steps are taken to see whether these goods are actually sold by the recipients of the shipments. The only evidence received in the trial concerning any such resale was to the effect that once in 1977 the president of PPC had seen some P&G minor brands including Sure Tampons on the shelves of a store in Milwaukee and had bought a box.

The Minor Brands Program includes 127 different brand names. These names are applicable to approximately 180 product categories. In comparison with these numbers P&G currently has 60 major products.

During the last ten years the number of new brands introduced into test markets was between 25 and 30. Thus if new brand introduction in test market were to continue at the same rate, P&G would have enough names in the Minor Brands Program to service the next 50 years of product introductions (on the assumption that every new product utilized a minor brand name).

The Minor Brands Program includes 13 brands for shampoo, as compared with one new brand introduced in the last 10 years and 3 major brand shampoos altogether. P&G's witnesses testified that the company had been laggard in new product introductions, especially in the growing shampoo market and that they expected the rate of introduction to improve. All the same, the minor brand name cupboard seems more than amply stocked.

Although the directive of legal counsel requires annual review for deletion from the minor brands program of brands which are of no commercial interest, the evidence suggests that this kind of policing does not command a high priority. Indeed the addition of names to the program seems to outpace deletions. The testimony of the P&G employee who controls minor brands for the toilet goods division established that this division, which introduced 5 new products into test in the last 10 years, has 25 to 30 minor brands reserved. He has been in his position for two years. During that time he added 10 names and dropped 4. One of his first acts was to drop the name SOAR for a deodorant because of its obvious inappropriateness. This testimony rather suggested that before his arrival in the position, little attention had been given to deletions. In the categories of mouthwash and shampoo which have 20 minor brand names between them, only 2 names had been dropped in 10 years.

P&G defends the validity of the Minor Brands Program on the grounds that it is commercially necessary. It argues that the development of new brands is an enormously lengthy process; numerous products are under development at any one time; and it

is very hard to tell how soon a product under development will be ready for market. The process of name selection and registration is also time-consuming. If a product should become ready for market without prior provision having been made for a name, the product could be held up for quite some time while the name was being secured.

P&G points out further that names enter the Minor Brands Program in numerous different ways and under different circumstances. In some instances a name goes into the Minor Brands Program upon its retirement as a major brand, with the expectation of reviving it on a future product. In other instances a name is selected and entered in the program specially for a product which is under development and expected to enter the market in the reasonably near future. In other instances the names are chosen because of the expectation that several new products will be emerging in that category in the foreseeable future. P&G's witnesses testified that as to each of the 180 minor brands the company has a present intention to use that brand name on a commercially marketed product in the future.

I recognize that these contentions could well justify some portion of the Minor Brands Program. I pass judgment here only on the establishment and maintenance of the three brands in contention. I consider the overall program only for the light it sheds on intent and other issues that arise as to the brands in question.

P&G has claimed rights to the Sure Tampon brand since 1964. P&G contends that since it was in litigation over the right to use the name Sure from 1964 to 1968, it is not reasonably chargeable with failure to use the name during that period. Taking the facts in the light most favorable to P&G, the Sure Tampon brand has resided in the Minor Brands Program for nearly 12 years, with approximately 50 cases being shipped once a year. The total revenues which P&G has realized from the sale of Sure Tampons are $874.70. During those years P&G has introduced one tampon prod-

uct into the commercial market. It did not receive the name Sure. P&G personnel testified that the company now has four or five catamenial products under development and five tampon names in the Minor Brands Program. P&G's personnel testified that they intend to use each of the minor brand names on a product to be introduced. But Sure has not been assigned to any of the products. While there may well be persons at P&G who would like to use the Sure name on a tampon to be marketed in the future, for the reasons indicated in my discussion of the likelihood of P&G's bridging the gap I find it most unlikely that the Sure name will be assigned to a tampon while P&G's uses that name on an anti-perspirant.

P&G has owned the Assure mark for shampoo and mouthwash since 1970. The shampoo mark has been maintained as a minor brand since 1970 bringing in total revenues of $491.30. The mouthwash brand has been in the program for only three years bringing in total revenues of $161.50; apparently for the first six years the Assure mouth wash brand was not utilized at all. P&G has introduced a new mouthwash and a shampoo into test markets without selecting the name Assure.

Applying to these facts the reasoning of the Court of Appeals in the *Snob* case, I find that P&G "has never put [these brands] on the market in any meaningful way; indeed, it has given no indication [which I would regard as convincing] that it has any current plans to do so." "Trademark rights are not created by sporadic, casual, and nominal shipments of goods bearing a mark. There must a trade in the goods sold under the mark or at least an active and public attempt to establish such a trade" 495 F.2d at 1272–74, citing *Clairol, Inc. v. Holland Hall Products, Inc.*, 165 USPQ 214 (Trademark Trial & App.Bd. 1970).

While P&G's annual shipment of 50 cases for periods of nine to twelve years may not be sporadic or casual, it is certainly nominal and does not represent a bona fide attempt to establish a trade in any meaningful way.

As the *Snob* opinion further points out "[a] trademark maintenance program obviously cannot in itself justify a minimal sales effort, or the requirement of good faith commercial use would be read out of trademark law altogether." 495 F.2d at 1273 n. 10; *See Blue Bell, Inc. v. Jaymar-Ruby, Inc.*, 497 F.2d 433, 437 (2 Cir. 1974).

■ I recognize that P&G's minor brands program might well be legally effective in other circumstances, as where a brand is reserved in connection with reasonably well-formulated plans to use it on a particular product under development, especially if the artificial maintenance does not continue for an unreasonably long time. See *PAB Produits*, 570 F.2d at 334 n. 10. But there must be a "present intent . . to market the trademarked product," *Snob*, 495 F.2d at 1272. P&G's vague, remote and almost abstract intentions for the Sure and Assure marks are not satisfactory. P&G's personnel testified, for example, as to each of its 13 minor shampoo brands (including Assure), that it held a present intention to utilize them on a commercially marketed product. At present, P&G offers only 3 shampoos on the commercial market. While there are several shampoos under development, I find no firm intention to use Assure on any of these. Intentions which are so vague and remote and so unlikely to come to fruition within a reasonable near future are not sufficient to meet the test.

A final consideration in assessing the validity of these three minor brands is the issue of bad faith and anti-competitive motive. The *Snob* court found as a factor supporting its decision that the principal and perhaps sole motive for the U.S. mark holder's maintenance program was to deprive a leading European competitor of the right to use that competitor's well-established European mark in the U.S. market. Defendant contends that the same kind of factor exists here. It maintains that P&G has no bona fide concern for the protection of the minor brands or of Sure anti-perspirant, but rather that P&G's sole motive in bringing the lawsuit is to wound, confound and delay the Assure tampon which will be a formidable competitor to P&G's Rely.

To the extent that P&G's suit is brought on behalf of Sure anti-perspirant, I believe it is brought in good faith. Although I have not found any likelihood of confusion or injury to the Sure anti-perspirant, P&G cannot be faulted for zealously protecting that trademark interest. Indeed, the trademark law not only encourages but requires one to be vigilant on pain of losing exclusive rights. *See* 3 Callmann ¶ 79.1. To the extent that the action was brought on behalf of these three minor brands, I believe that P & G had only negligible concern for their preservation. Regardless, the invocation of the minor brands rights is justifiable on the grounds that in going to war for Sure anti-perspirant, P&G was entitled to use all the ammunition it had.

On the other hand, a victory for P&G in this lawsuit would benefit the Rely tampon far more than any other commercial interest of P&G. It would set back one of Rely's strongest competitors for at least 1½ years (and possibly much more). In authorizing this lawsuit, P&G's executives cannot have been unaware of the enormous potential value of such a victory to the Rely tampon.

While P&G unavoidably has an anti-competitive interest in this lawsuit, its other justifiable interest overcomes the suggestion of bad faith. If the bringing of the lawsuit was justifiable on behalf of the Sure anti-perspirant mark, plaintiff was entitled to bring it even though it stood to benefit in other interests as well.[8]

I conclude nonetheless that P&G owns no enforceable rights in Sure tampon brand or in the Assure mark and that its action on behalf of those interests must fail. P&G has failed to show that it established trademark rights through bona fide commercial use.

■ P&G also seeks comfort from the fact that its Sure tampon mark had become "incontestable" by the filing of an affidavit

---

8. The same conclusions apply to any competition between Sure & Natural Maxishields and P&G's hypothetical equivalent assuming them to be in a race for priority.

of continued use after five years, so that only abandonment or fraud could invalidate the registration. 15 U.S.C. § 1064(c). This was also true of the *Snob* mark although its registration had subsequently lapsed.

This argument gives unwarranted significance to incontestability. It would be odd indeed if, while a mark acquires no rights without use, non-use, continued for a long enough time and accompanied by an inaccurate affidavit proclaiming use, would bring it to life. The provisions of 15 U.S.C. § 1065 do not overcome the theory of the *Snob* case, and do not overcome the fact that legal rights to the exclusive use of the mark were never acquired by use in commerce.

### (c) The Effect of the Board's Default Judgment

■ P&G argues that the decision of the Patent Office granting judgment in its favor by default on PPC's petition to cancel its Sure tampon mark precludes reconsideration of the validity of the mark. I do not agree.

The patent office decision was subject to review by this court pursuant to 15 U.S.C. § 1071(b).

> The civil action before the District Court is intended to be a trial de novo, though the decision of the Patent Office must be accepted as controlling on issues of fact unless the contrary is established by testimony which in character and amount carries thorough conviction. . . . The dissatisfied party must be afforded the opportunity to elicit and introduce additional evidence, and the court cannot freeze the record on the proceedings before the Board. . . .

*Wilson Jones Co. v. Gilbert & Bennett Mfg. Co.,* 332 F.2d 216, 218 (2d Cir. 1964) (citations omitted).

Plaintiff contends that since no evidence was before the Board, the only issue before this court is the propriety of the default judgment. At least absent a showing of bad faith, I do not find any such limit on the scope of review.

Nor do I find any merit in the plaintiff's contention that since abandonment was the only issue raised before the Board, it is the only issue which may be considered by this court. This litigation initiated by P&G requires the decision of countless issues which were not before the Board. For example, P&G claims of infringement require a decision as to whether P&G owns protectible rights in its marks. To contend that one segment of the issues is limited by the framing of the pleadings in the Patent Office would lead to odd, if not inconsistent, results. Where the proceeding before the Board has been supplanted by a broader litigation, I find no force or merit in this contention. Furthermore, the court is specifically empowered to determine the cancellation issue. 15 U.S.C. § 1119.

Even if the only question before me were the propriety of the Patent Office action on the record before it, I would have substantial doubt whether its entry of a default judgment in these circumstances and its refusal to lift it on appeal was a proper exercise of discretion. It is clear that PPC was neither neglecting its lawsuit nor manipulating competing forums in bad faith. PPC proceeded diligently and in good faith, shifting its attention to the court of general jurisdiction to which its adversary had removed the controversy. Its omission was not so much the failure to file proof according to the Board's schedule, but rather the failure (by reason of its assumption that this would be done by its adversary) to notify the Board that the district court action had superceded the administrative proceeding. I find the imposition of default quite unreasonable in the circumstances. *See* 6 Moore, Federal Practice ¶ 55.10[1] (2d ed. 1965).

■ For the same reasons, this would not be an appropriate case to give res judicata effect to the Board's entry of default. To do so would lead to a captious and unfair result.

> Since the doctrine [of res judicata] is intended to serve the aims of fairness and efficient judicial administration, it need not be applied mechanically where those

ends would not be served. As we have noted on several occasions, res judicata principles, if applied inflexibly, can at times result in unwarranted hardship . . .

*Snob*, 495 F.2d at 1276 (citations omitted); See also 1B Moore, Federal Practice. ¶ 0.410[2] at 1169 (2d Ed. 1965).

Given the absence of any bad faith or manipulative intent on PPC's part, the bona fide misunderstanding which led to the default, the absence of any actual prejudice to P&G because of the delay in adjudication, the importance of resolving the validity of plaintiff's marks on the merits, and the unfairness of the default, res judicata should not be applied to foreclose the receipt of proofs on the merits.

*(d) Plaintiff's Other Claims*

■ Plaintiff's statutory unfair competition claim is founded upon § 43(a) of the Federal Trademark Act, 15 U.S.C. § 1125(a), which prohibits false designations as to the origin of goods and false descriptions of goods. For the reasons indicated above, I find that there is no likelihood of confusion between plaintiff's and defendants' goods and that P&G has failed to support its claim of false designation. See *Societe Comptoir v. Alexander's Department Stores, Inc.*, 299 F.2d 33 (2 Cir. 1962); *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403 (S.D.N.Y.1974).

■ Plaintiff's false description count alleges that PPC had no basis for its claims of a "new concept" in tampons and of "the best deodorant in tampons." As to the "new concept" P&G contends that its own Rely, Playtex and J&J's o.b. are comparable in radial expansion. While it is true that Rely and Playtex do expand radially, this is only at one end of the tampon, and not throughout their length, as in the case of Assure. Their design, construction and fit are sufficiently different from Assure to permit the making of this claim. While o.b. is similarly constructed and does expand throughout its length, the product differs from Assure in several significant respects

including the fibres used, the lack of applicator, the different accessibility of the string and the lack of fragrance.

As to Assure's claim of the best deodorant, this was supported by consumer preference testing at the time the claim was made. Subsequently, Playtex, the only competitor offering a deodorant tampon, altered its fragrance. Consumer tests then no longer supported the claim and it was dropped.

I find P&G has failed to support the claim of false description.

Plaintiff's claim of common law unfair competition seeks to protect its interest in preventing free rides on its brand, as well as confusion. I have found no substance to this claim.

■ Its action for trademark dilution is founded upon § 368–d of the New York General Business Law which provides:

"Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services"

The purpose of this statute is the "prevention of trade-mark or trade name dilution—i. e., 'the whittling away of an established trade-mark's selling power and value through its unauthorized use by others upon dissimilar products.'" *Allied Maintenance v. Allied Mechanical Trades*, 42 N.Y.2d 538, 542, 399 N.Y.S.2d 628, 630, 369 N.E.2d 1162, 1164 (1977).

My findings concerning the weakness of plaintiff's mark, *see Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403 (S.D.N.Y.1973) the high quality of defendant's products, see *Philip Morris Inc. v. R. J. Reynolds Tobacco Co.*, 188 USPQ 289 (S.D.N.Y.1975), and the lack of essential similarity between the parties' marks compel the conclusion that there is no likelihood of injury to P&G's reputation

or dilution of its Sure mark in defendant's use of its marks. Therefore this final claim must also be denied.

IV. *Observations on Current Brand Selection Standards.*

The evidence in this case of brand selection practices by today's major marketing companies raises some concern as to whether the benefits of the federal trademark law are being diverted to uses for which they were never intended.

The trademark law confers a legally protected monopoly on the brand owner. The origin and purpose of this monopoly is to permit manufacturers and distributors to identify their goods to the public and distinguish them from goods manufactured or sold by others. See 15 U.S.C. § 1127 (defining "trade-mark"); 3 Callmann § 65. It permits the manufacturer to benefit from the goodwill that he has earned by distributing satisfactory products in the past. To a like extent it protects the consuming public, by offering it an opportunity to select the goods of dependable manufacturers and to avoid the goods of those who have disappointed them in the past. It prevents charlatans from trading on reputations earned by others.

The monopoly conferred is justified by those very considerable advantages which it offers to all legitimate interests. At the same time such a monopoly is virtually without cost to society. Where all that has been conferred under exclusive title is the right to use a unique identifying mark or word to identify one's goods, society has been deprived of nothing by the giving of exclusive rights to each user. Distinctive marks are plentiful almost without limit, as long as people possess imaginations to create them. The monopoly therefore has double justification, both from the benefits the practice confers and from the lack of any significant cost or sacrifice to society.

In conferring its monopoly rights, it was never the purpose of the trademark laws to give any producer of goods an exclusive right to claim benefits of a product through the name. It is identification that justifies the system. Thus the body of trademark law has developed its spectrum of strength and weakness, according to which generic and descriptive names are generally not entitled to protection, the strongest protection being reserved for marks which are arbitrary or fanciful.

The evidence in this case suggests that major marketers today are selecting brand names according to principles which are not only inconsistent with the policies and justifications of the trademark laws but almost contrary to them. The evidence suggests that names are no longer being selected for identification. They are being selected rather for the purpose of building into the name descriptions or praises of the product's claimed benefits.

One of the nation's leading advertising executives described it as follows. "The name is a crucial part, because eventually the name selected has to reflect the claims you are talking about." A new product development manager for a major manufacturer of consumer products testified on brand name selection, "Tell her what it's going to do for her; tell her how it is going to make her feel and try to give her a reason to believe that all at the same time." Endless testimony was received to the effect that the value of names like Sure, Rely, and Assure lay in their capacity to inspire the confidence of the consumer.

The testimony of both companies as to the potential brand names which have received their most serious attention for menstrual protection products confirms these indications. At P&G the company's first named tampon was given the name Rely. The five names held in reserve for use of future such products are Soft Shape, Soft and Certain, Sure, Merit and Always. At J&J's Personal Products subsidiary, two years after the introduction of P&G's Rely tampon, an internal memo noted "We continue to search for a Rely type handle." Among the names receiving prime consideration were Assurance Plus, Protection Plus, Surity, Assure, Feel Free, Free 'n Easy. When PPC came in 1978 to the naming of its new thin "Maxishield," the leading can-

didates were Natural Comfort, Sure Comfort, Protection Plus, Surity, Sure & Natural, Feel Free and Thin 'n Sure.

It seems perfectly clear that major marketers today are seeking to appropriate to their exclusive use names which convey as much of the essential advertising message for their product as the trademark laws will tolerate.

The practice seems worthy of mention because the justifications for the lawful monopoly granted by the trademark laws are scarcely present when trademarks are selected in this fashion. Looking first at the social costs, it is highly doubtful whether a single entity in commerce should be granted the exclusive right to use a name consisting of common English words which describe or evaluate the claimed virtues of the product. There are only a few familiar words in the language which say what is said by "Rely" and "Assure". It is quite difficult to justify a grant of a monopoly over the use of those words in their primary senses.

The practice also undermines the principal purpose of the trademark laws which is to avoid confusion in the marketplace. As the practice becomes more widespread, the products of competitors come to be identified by increasingly similar names. Since such trademarks are inherently weak, their exclusivity being limited to the narrow area in which the name is being used, other companies may come in and use the same or similar names on other products. The marketplace becomes a jumble of similar, non-distinctive adjectival or laudatory brand names. And when the "Sure's" have been exhausted, the marketers will turn to the "Sure & Naturals". As the two word combinations become exhausted they will go to three, or to inverted combinations.

For two reasons, court judgments are not best suited to redress this tendency: first, only a tiny number of trademark selections are reviewed in court. Secondly, when a dispute comes to court, the litigant has generally made a major investment or built significant goodwill around the brand name. A court is understandably reluctant to reach judgments which will have harsh effects, will destroy good faith expectations, and often reward unworthy imitators. The more effective and fairer exercise of controls would be at the earliest stages upon application to register.

If, as the evidence in this case suggests, the marketing industry is crowding closer and closer against the line which separates the unregistrable descriptive mark from the suggestive, I raise the question whether the Patent and Trademark office ought to adopt interpretations which raise the standard and require higher quotients of fancy, imagination or arbitrariness in order to qualify.

Submit judgment.

SO ORDERED.

### SUPPLEMENTAL FINDINGS

■ Upon submission of forms of judgment for entry, P&G contends that PPC's application for the cancellation of P&G's Assure marks for mouthwash and shampoo should be denied because PPC has failed to demonstrate that it is damaged by the continued registration of those marks. P&G contends that such proof of damage is required by the terms of § 14 of the Lanham Act, 15 U.S.C. § 1064. *See Fuller Products Co. v. Fuller Brush Co.*, 299 F.2d 772 (7th Cir. 1962); *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F.Supp. 1261, 1269 (S.D.N.Y.1970).

PPC responds that the provisions of § 14 are only applicable when the petitioner initiates an action seeking cancellation. It argues that where cancellation is sought defensively, the provisions of § 37, 15 U.S.C. § 1119, establish the court's power to order cancellation irrespective of proof of damage. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1972).

Assuming, but not deciding that P&G is correct in its statutory interpretation, I find that PPC has demonstrated such damage as may be required by the terms of § 14. P&G brought this action in part on behalf of its Assure marks seeking to enjoin PPC's use of Assure for tampons. When PPC was

forced to defend this action, it sustained damage and was put in fear of further damage sufficient to justify its plea for cancellation.

If, while P&G's action was pending, PPC had brought a cancellation proceeding in the Patent Office directed at the Assure marks, I have no doubt that the fact of P&G's attack on PPC's Assure mark would have provided the showing of harm necessary to satisfy the damage requirement of § 14. This is no less so because PPC chose to assert the plea by answer and counterclaim rather than by a separate cancellation proceeding in the patent office. At the time these demands were asserted by PPC it was clear that P&G's demand for an injunction presented a real possibility of damage to PPC. PPC cannot have lost such standing by prevailing in the lawsuit. P&G, having required PPC to defend a lawsuit brought on behalf of P&G's Assure marks, cannot reasonably be heard to deny that its Assure marks are damaging to PPC. Damage has already been inflicted.

Moreover, P&G's action suggests the possibility of still further harm to PPC's right to register, freely use, and expand its use of its Assure mark if registration of P&G's marks is continued.

Accordingly the judgment will provide for cancellation of P&G's Assure marks.

So ordered.