THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
May 2, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
____

Trademark Trial and Appeal Board
____

*Inter IKEA Systems B.V.*
*v.*
*Akea, LLC*
____

Opposition No. 91196527
____

Richard Lehv of Fross Zelnick Lehrman & Zissu PC for Inter IKEA Systems B.V.

T. Robert Rehm, Jr. of Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P. for Akea, LLC.

____

Before Taylor, Bergsman and Ritchie, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

On June 17, 2009, Akea, LLC ("applicant") filed an intent-to-use application to register the mark AKEA, in standard character form, for the following goods and services:[1]

> Nutritional supplements; herbal supplements; vitamin and mineral supplements, in Class 5;

____

[1] Serial No. 77761765.

> Retail services by direct solicitation by sales agents in the field of nutritional supplements, herbal supplements and vitamin and mineral supplements; online retail store services featuring nutritional supplements, herbal supplements, and vitamin and mineral supplements; providing advice and information in the field of career and business opportunities, in Class 35; and
>
> Providing advice and information to consumers regarding lifestyle topics, namely, diet planning, nutrition, nutritional supplements, and gardening, in Class 44.

During the prosecution of the application, applicant added the statement that "the English translation of 'AKEA' in the mark is may you live 100 years."

Inter IKEA Systems B.V. ("opposer") opposed the registration of applicant's mark for all the goods and services on the ground of likelihood of confusion, Section 2(d) of the Trademark Act of 1946, 15 U.S.C. § 1052(d), and dilution, Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c).[2]  With respect to its likelihood of confusion claim, opposer alleges that applicant's mark AKEA for the goods and services identified in the application so resembles opposer's registered mark IKEA for a wide variety of goods and services including food products, restaurant services and educational services in the field of personnel management and personal development as to be likely to cause confusion.  Opposer claimed ownership of eight (8) registrations including the following:

---

[2] Opposer also opposed registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that the mark is merely descriptive.  Because opposer did not pursue this claim during trial or in its brief, we find, in accordance with the Board's usual practice, that the claim is waived. *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.,* 107 USPQ2d 1750, 1753 (TTAB 2013).

1.  Registration No. 1418733 for the mark IKEA, in typed drawing form, for "retail store services in the field of furniture, housewares and home furnishings; and restaurant and catering services," in Class 42;[3] and

2.  Registration No. 1661360 for the mark IKEA, in typed drawing form, for *inter alia* the following goods and services:[4]

> Canned and frozen meat, fish and shellfish; jams, preserves and pickles, in Class 29;
>
> Coffee, bread, biscuits, cakes, pastry, candy, mustard, sauces excluding cranberry and applesauce, and spices, in Class 30;
>
> Live plants and flowers, dried flowers, and flower seeds, in Class 31; and
>
> Educational courses and seminars in the fields of retailing of furniture and home furnishings, shop window dressing, sales techniques, personnel management, interior decoration and personal development, in Class 41.

Applicant denied the salient allegations of the notice of opposition.

### The Record

At the outset, we note that applicant has filed numerous objections to certain testimony and exhibits introduced by opposer. Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations, and this precludes the need to strike the testimony and evidence. Given the circumstances herein, we choose not to make

---

[3] Issued November 25, 1986; renewed. Effective November 2, 2003, Trademark Rule 2.52, 37 C.F.R. § 2.52, was amended to replace the term "typed" drawing with "standard character" drawing. A mark depicted as a typed drawing is the legal equivalent of a standard character mark.

[4] Issued October 22, 1991; renewed.

specific rulings on each and every objection. As necessary and appropriate, we will point out in this decision any limitations applied to the evidence or otherwise note that the evidence cannot be relied upon in the manner sought. While we have considered all the evidence and arguments of the parties, we do not rely on evidence not discussed herein.

On June 22, 2013, the parties filed a stipulation for the introduction of testimony and evidence. Pursuant to the stipulation, the direct testimony of all witnesses could be introduced by sworn declarations or affidavits, and all documents produced in response to a request for production of documents were deemed authentic business records and were admissible subject to any objections other than authenticity.

The record includes the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), applicant's application file. In addition, the parties introduced the following testimony and evidence:

A.     Opposer's evidence and testimony.

1.     Notice of reliance on certified copies of opposer's pleaded registrations showing the current status and title of the registrations;

2.     Testimony declaration of Robert Wotherspoon, IKEA Food Manager U.S., with attached exhibits; and

3.     The rebuttal testimony declaration of Robert Wotherspoon.

4

B.     Applicant's evidence and testimony.

Applicant filed the testimony declaration of William Bernecki, applicant's Chief Operating Officer, with attached exhibits.

Standing and Priority

Opposer is Inter IKEA Systems B.V. The certified copies of opposer's pleaded registrations showing the status of and title to the registrations identify opposer Inter IKEA Systems B.V. as the owner of the registrations. Applicant, citing paragraph No. 2 of the Wotherspoon Declaration, argues that because Mr. Wotherspoon testified that IKEA Group is the owner of the pleaded registrations IKEA Systems B.V. is not the proper opposer.[5] Specifically, in paragraph No. 2, Mr. Wotherspoon testified as follows:

> 2.     I am employed by IKEA North American Services, LLC, which is part of the IKEA Group. The IKEA Group, which includes Opposer, INTER-IKEA SYSTEMS B.V., is one of the world's largest retailers, and is owner of one of the world's most famous trademarks and service marks, IKEA.

We do not agree with applicant's contention that that Mr. Wotherspoon testified that there has been a change of ownership with respect to opposer's pleaded registrations. Mr. Wotherspoon's explained that opposer is part of the IKEA Group, and that, therefore, the IKEA Group has a direct interest in the IKEA trademark registrations and is entitled to rely on the IKEA trademark registrations through its relationship with Inter IKEA Systems B.V.

---

[5] Applicant's Brief, p. 42.

Because opposer has properly made the pleaded registrations of record, opposer has established its standing. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). In addition, Section 2(d) priority is not an issue in this case as to the marks and the goods and services covered by the pleaded registrations made of record. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).

A.    The fame of opposer's mark.

This *du Pont* factor requires us to consider the fame of opposer's marks. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002*); Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales of and advertising expenditures for the goods and services identified by the marks at issue, "the length of time those indicia of commercial awareness have been evident," widespread critical assessments, and through notice by independent sources of the products identified by the marks, as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Products Inc.*, 63 USPQ2d at 1305-1306 and 1309. Although raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, raw numbers alone may be misleading. Some context in which to place raw statistics may be necessary (e.g., the substantiality of the sales or advertising figures for comparable types of products or services). *Bose Corp. v. QSC Audio Products Inc.*, 63 USPQ2d at 1309.

Opposer introduced the evidence set forth below to demonstrate the fame of its IKEA marks. Much of opposer's evidence was designated as confidential and filed under seal and, therefore, we refer to such evidence only in general terms.

1.    There are 38 IKEA stores in the United States. These stores are located in the most-heavily populated areas of the country, such as Boston, New York, Philadelphia, etc. Consumers travel up to two hours to visit IKEA stores.[6]

2.    "Annually, [opposer] has over fifty million store visits in the U.S."[7] Opposer provided specific numbers for 2007 through 2011.

---

[6] Wotherspoon Dec., ¶11.

[7] Wotherspoon Dec., ¶18.

3. "[Opposer] has approximately 150 million visits annual [sic] to its website from Internet users in the U.S."[8] Opposer provided documentary support for specific numbers from November 2008 through July 2012.[9]

4. Opposer distributes "well over twenty million catalogs" a year in the United States.[10] Opposer provided specific numbers for 2008 through 2013.

5. Opposer has spent over $160 million annually advertising and promoting the IKEA marks in the United States.[11] Opposer provided specific numbers from 2007 through 2011. Opposer has advertised in national publications such as *Better Homes and Gardens*, *O* magazine and *Everyday with Rachael Ray*. It has also advertised on broadcast and cable television as well as major websites such as shopzilla.com, aol.com, nfl.com and foodnetwork.com.[12]

6. "Opposer also annually distributes hundreds of millions of copies of 'free standing inserts' (advertising flyers) directly by mail to homes around the country. … These are issued 14 to 16 times per year."[13] Opposer submitted specific numbers for 2007 through 2012.

---

[8] Wotherspoon Dec., ¶19.

[9] Wotherspoon Dec., Exhibit 3.

[10] Wotherspoon Dec., ¶20.

[11] Wotherspoon Dec., ¶23.

[12] Wotherspoon Dec., ¶24. Opposer did not introduce any testimony or evidence regarding how many people saw these advertisements. In general, simply advertising in national magazines without evidence of circulation may be probative for purposes of proving the fame or renown of marks for purposes of likelihood of confusion. However, for the rigorous standard required to prove fame for dilution purposes, more information may be required. *See* footnote 18 below.

[13] Wotherspoon Dec., ¶26.

7.  "The IKEA brand was ranked No. 28 on the Business Week/Interbrand 2012 list of the Top 100 Brands worldwide, with an estimated brand value of $12,808,000,000."[14]

8.  Opposer's food sales, including sales in its restaurants and Swedish Food Markets in the United States have been substantial by any standard.[15] Opposer provided annual sales figures for 2007-2012.

9.  Opposer's sale of live plants has been successful but not nearly on the scale of its food sales.[16] Opposer provided annual sales figures for 2008-2012.

10.  Opposer asserts that its marks "have received substantial unsolicited media attention" "discussing the fame of the IKEA products or illustrating IKEA products," as shown by Wotherspoon Exhibits 7 and 8.[17] The following examples are representative:

> a.  Chicagotribune.com (March 3, 2011). An article entitled "Bookshelves with a chance of meatballs" refers to IKEA as "Swedish meatball's greatest ambassador" while noting "[w]ho would have thought a furniture store would lead the noble charge." There is also a quote from the executive director of the Swedish American Museum in

---

[14] Wotherspoon Dec., ¶27. The Business Week/Interbrand 2012 list of Top 100 Brands has limited probative value because opposer did not introduce any evidence regarding the criteria used to compile this list or to estimate the brand value. It is admissible only to show what has been published, not the truth of what has been printed. *See Safer Inc. v. OMS Investments Inc.,* 94 USPQ2d 1031, 1040 (TTAB 2010).

[15] Wotherspoon Dec., ¶15. The figures were filed under seal and, therefore, we may only refer to them in general terms.

[16] Wotherspoon Dec., ¶17.

[17] Wotherspoon Dec., ¶25.

Andersonville, Illinois that "most of us will go to Ikea and buy their meatballs so we don't have to make them at home."

b.    Philly.com (September 11, 2009). An article entitled "Ikea cafeteria: Serious bang for the buck." This article notes how opposer is trying to keep consumers in opposer's stores by making a visit a family event and providing a review of opposer's restaurant services. *See also* Raisingarizonakids.com (September 2009), "On top of those meatballs."

c.    The remainder of the references are to IKEA products as design innovations. For example, in the January 2011 issue of *Better Homes and Gardens*, "In plain sight," the author wrote the following:

> Designer Amy Meier squeezed a fully functioning office into her San Diego dining area. She started with an IKEA bookcase and shelves and a metal desk. Next she organized fabric samples and papers into a carefully planned mix of baskets, bins, and binders.

We note that the probative value of opposer's evidence of fame might be bolstered if opposer also offered evidence that would provide additional context to the data, such as data concerning competitors' performance as to the criteria at issue. However, we acknowledge that some such comparative information may be difficult, if not impossible to obtain, because companies may view such information as proprietary and not disclose it publicly. Nevertheless, after carefully reviewing this evidence, we find that opposer's IKEA mark has become famous for purposes of likelihood of confusion for its "retail store services in the field of furniture,

housewares and home furnishings."[18]  The testimony and evidence regarding particular products and restaurant services are not specific enough to support finding fame of the mark for individual products and the other listed services.  To the extent that consumers recognize the IKEA mark in connection with furniture, housewares, home furnishings, food products and restaurant services, that is a result of the fame of the retail stores.

In view of the foregoing, we find that for purposes of the likelihood of confusion analysis, the IKEA mark is famous for "retail store services in the field of furniture, housewares and home furnishings" and otherwise a strong mark for the furniture, housewares, home furnishings, food products, and restaurant services themselves.

B.  The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We turn next to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.  *In re E. I. du Pont De Nemours & Co.,* 177 USPQ at 567.  In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under

---

[18] For purposes of likelihood of confusion, the Board generally accepts and considers evidence related to likelihood of confusion for the period up to the time of trial, and this includes evidence of the fame of a plaintiff's mark.  This is distinct from a claim of dilution under Section 43(c) of the Trademark Act where an element of the claim is the acquisition of fame prior to the defendant's first use or application filing date.  *General Mills Inc. v. Fage Dairy Processing Industry SA,* 100 USPQ 1584, 1595 n. 13 (TTAB 2011).

the respective marks is likely to result. *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd unpublished*, No. 92-1086 (Fed. Cir. June 5, 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Winnebago Industries, Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975).

Opposer's mark is IKEA and applicant's mark is AKEA. The marks are similar in appearance in that they are the same number of letters, they both begin with a vowel and end in "K-E-A." Thus, because the two marks have the same structure, there are similarities in the way they sound (ī key ă vs. ā key ă or ă key ă).[19] In fact, IKEA and AKEA rhyme. Regardless of the pronunciation of the first vowel, the remainder of the marks will be pronounced the same.

---

[19] We are aware that there is not necessarily one correct pronunciation for a mark. Therefore, we have considered all the reasonable possibilities. *Centraz Industries, Inc. v. Spartan Chemical Company,* 77 USPQ2d 1698, 1701 (TTAB 2006) (in comparing the marks iShine and ICE SHINE, the Board found "that purchasers may roll the 's' sound from the pronunciation of "ice" into the "sh" sound beginning the second syllable "shine."); *Edison Brothers Stores, Inc. v. Brutting E.B. Sport-International GmbH,* 230 USPQ 530, 533 (TTAB 1986) (while noting that it is impossible for a trademark owner to control how its mark will be pronounced, the Board stated that with regard to sound, "absent evidence to the contrary, we must consider all of the possibilities that are reasonable, considering the nature of the goods and their purchasers."). *See also Pfizer Inc. v. Cody John Cosmetics, Inc.,* 211 USPQ 64, 69 n.4 (TTAB 1981) ("the pronunciation of 'COTY' as 'CODY' is *not* incorrect.") (emphasis in the original).

IKEA is a coined and arbitrary term with no apparent meaning in any language. Robert Wotherspoon testified that IKEA "was coined from the first letters of [opposer's founder] Ingva Kamprad's first and last names, and the first letters of the name of the farm (Elmtaryd) and village (Agunnaryd) in which he grew up."[20]

AKEA also is a coined term and apparently not a word in any language. Although applicant's application includes a translation statement, William Bernecki, applicant's Chief Operating Officer, testified that AKEA is derived from the Sardinian greeting "A kent'annos," "a traditional saying that has been translated as 'may you live to 100,' 'may you live 100 years,' and variations thereon [sic]."[21] Whether AKEA is a coined term or a Sardinian greeting, it is an inherently strong mark.

Where, as here, both marks are coined terms that look alike and sound alike and there are no known differences in the meaning to distinguish them, the marks engender a similar commercial impression. *See E.I. du Pont de Nemours and Co. v. Yoshida International Inc.,* 393 F.Supp. 502, 185 USPQ 597, 604 (EDNY 1975) (TEFLON and EFLON found similar because of the shared letters and because the use of coined words without known, distinctive meanings renders confusion more likely); *Procter & Gamble Co. v. Johnson & Johnson,* 485 F.Supp. 1185, 205 USPQ 697, 708 (SDNY 1979) ("When arbitrary or fanciful marks are involved, the distinctiveness of the marks will make the public more conscious of similarities

---

[20] Wotherspoon Dec., ¶9.

[21] Bernecki Dec., ¶¶5 and 6.

13

than differences. … In contrast when common words are involved … the degree of difference rather than the degree of similarity is likely to be more noticeable."), *aff'd without opinion,* 636 F.2d 1203 (2d Cir. 1980). *Compare Ava Enterprises, Inc. v. P.A.C. Trading Group, Inc.,* 86 USPQ2d 1659, 1661 (TTAB 2008) (the word BOSS in opposer's pleaded mark and the word BOOSTER in applicant's mark have such different meanings that they cannot be found to be similar). In other words, the average purchaser would not associate the names IKEA and AKEA with any familiar meanings through common usage and exposure and, therefore, this is not a basis on which average purchasers would be able to distinguish them.

In view of the foregoing, we find that the marks are similar when considered in light of a purchaser's general recollection or imperfect recall of marks and the absence of a situation whereby side-by-side comparisons of the marks would be readily available. This is especially true in this case where we have found opposer's IKEA mark to be famous for certain services and, as discussed above, the fame of opposer's mark necessarily weighs heavily in opposer's favor.

C.    The similarity or dissimilarity and nature of the goods and services.

Opposer has registered its IKEA marks for "retail store services in the field of furniture, housewares and home furnishing; and restaurant and catering services," as well as for a wide variety of goods and services including food products and educational services in the field of personnel management and personal development.

Applicant is seeking to register its AKEA mark for (1) nutritional, herbal, vitamin and mineral supplements; (2) direct solicitation retail services and online retail sales of nutritional, herbal, vitamin and mineral supplements; (3) providing advice and information in the field of career and business opportunities; (4) and providing advice and information to consumers regarding lifestyle topics, namely, diet planning, nutrition, nutritional supplements, and gardening.

Opposer argues that its IKEA goods and services are related to applicant's nutritional, herbal, vitamin and mineral supplements because opposer sells a Rosehip Drink which contains vitamins A and C, an Elderflower Drink, and a Lingonberry Drink and because opposer sells seeds to grow herbs at home.[22] The fruit juices are not listed in the description of goods for any of opposer's registrations and opposer did not plead common law use of its mark on fruit juices. Although opposer alleged use of its IKEA mark on "food" (Notice of Opposition, ¶2), that does not put applicant on notice that opposer is claiming use of its mark on fruit juices. In this regard, we note that applicant in its brief at pages 16-17 states that opposer appears to rely on registration Nos. 1418733, 1661360 and 3561226. In the appendix to its brief, applicant objected to any testimony and exhibits related to any products not listed in these pleaded registrations. (Applicant's Brief, pp. 41, 45 and 60). In view of the foregoing, we find that the issue of likelihood of confusion with opposer's IKEA mark on fruit juices was not tried by implied consent and therefore should not be considered. Fed.R.Civ.P. 15(b)(2). Also, we note that

---

[22] Wotherspoon Dec., ¶¶ 14 and 17 and Exhibit 2.

because opposer has not registered its IKEA mark for fruit juices and because it has not introduced any testimony or evidence regarding the first use of its mark for fruit juices, it has not established priority of its IKEA mark for fruit juices.

Moreover, even if opposer had properly pleaded and proved common law rights in its IKEA mark for its fruit juices, the testimony and evidence fail to show that "retail store services in the field of furniture, housewares and home furnishing and restaurant and catering services" as well as opposer's wide variety of goods and services including food products and Rosehip, Elderflower and Lingonberry drinks are related to nutritional, herbal, vitamin and mineral supplements, direct solicitation retail services and online retail sales of nutritional, herbal, vitamin and mineral supplements or providing advice and information to consumers regarding lifestyle topics, namely, diet planning, nutrition, nutritional supplements, and gardening. We specifically note the lack of any evidence regarding the purported health benefits of opposer's fruit juices that would provide any link to applicant's dietary supplements.

Opposer argues that there is a direct connection between applicant's supplements and opposer's fruit juices because applicant's supplements may be mixed into juices.[23] Again, opposer's use of its mark for juices was not pleaded or tried by consent. Moreover, we are not persuaded that consumers will believe that nutritional, vitamin, herbal and mineral supplements emanate from the same

---

[23] Opposer's Reply Brief, p. 9.

source as fruit juices just because the dietary supplements may theoretically be mixed into fruit juices.

Opposer further argues that "[n]umerous cases have held nutritional supplements to be related to food and beverages for purposes of the likelihood of confusion analysis," relying on three non-precedential decisions.[24]  However, prior cases, precedential or not, are only useful to the extent that the facts in the prior cases are somewhat analogous to the facts in the current case.  *See In re Fleet-Wing Corp.,* 188 F.2d 476, 89 USPQ 369, 370 (CCPA 1951) ("It may be said at the outset that in cases like that at bar where the registration of one mark over a similar mark for goods of the same class is involved, there is rarely any decision of any court that is sufficiently analogous to be absolutely controlling. . . . Where the circumstances in a decided case differ, even only to a slight degree, from those in a case to be decided, it is often difficult to determine just what effect those differences should be given.") (citation omitted); *In re Jeep Corporation,* 222 USPQ 333, 335 n.2 (TTAB 1984) (each case must be decided on its own facts and merits, but prior cases have precedential value to the extent that they may involve similar facts); *cf. In re Johanna Farms Inc.,* 8 USPQ2d 1408, 1410 (TTAB 1988) (*stare decisis* provides that "when a court has laid down a principle of law as applicable to a certain set of facts, it will adhere to that principle, and apply it to all future cases, where the facts are

---

[24] Opposer's Brief, p. 15.  Although parties may cite to non-precedential decisions, the Board does not encourage the practice.  *Corporacion Habanos SA v. Rodriguez,* 99 USPQ2d 1873, 1875 n.5 (TTAB 2011).  *See also In re Luxuria s.r.o.,* 100 USPQ2d 1146, 1151 n.7 (TTAB 2011) (parties may cite to non-precedential decisions, but they are not binding on the Board and because they have no precedential effect, the Board generally will not discuss them in other decisions).

substantially the same, regardless of whether the parties and properties are the same."). In this case, there is no testimony or evidence regarding the relationship between opposer's goods and services and applicant's nutritional, herbal, vitamin and mineral supplements to compare to the facts in the cited cases.

On the other hand, opposer's "educational courses and seminars in the fields of … personal development" and applicant's "providing advice and information in the field of career and business opportunities" are closely related because the term educational services regarding personal development is broad enough to encompass advice and information regarding career and business opportunities. Personal development means individual growth or progress. Individual growth or progress may include one's career and business opportunities. Accordingly, educational services in the field of personal development are closely related to providing advice regarding career and business development.

We find that the record in this case shows that the only related goods and services are opposer's "educational courses and seminars in the fields of … personal development" and applicant's "providing advice and information in the field of career and business opportunities."

D.    The established likely-to-continue channels of trade and classes of consumers.

Opposer sells its products through its retail stores, its website and through catalogs.[25]

---

[25] Wotherspoon Dec., ¶¶11, 12 and 18- 21.

Applicant does not sell its products through retail stores. Applicant sells its products through "independent sales consultants." "After a customer places an order with a consultant, [applicant] delivers [the products] to the customers via a drop shipment."[26] Applicant also has a website through which customers may purchase products.[27]

Opposer argues that because the description of goods for applicant's nutritional, herbal, vitamin and mineral supplements is not restricted to any channels of trade or classes of consumers, the supplements are presumed to move through all the ordinary and usual channels of trade and to all the usual customers for nutritional, herbal, vitamin and mineral supplements. Accordingly, opposer concludes that, "the trade channels of and customers for Applicant's goods offered under the AKEA Mark are presumed to overlap with Opposer's trade channels and customers for its goods under the IKEA Mark. Applicant could, like Opposer, offer its products in retail stores, through catalogs, and over the Internet."[28]

There are two problems with opposer's argument. First, there is no evidence in the record, except applicant's description of how it sells its nutritional, herbal, vitamin and mineral supplements, as to the ordinary and usual channels of trade for nutritional, herbal, vitamin and mineral supplements. Accordingly, opposer is asking us to assume, rather than require opposer to prove, that nutritional, herbal, vitamin and mineral supplements move in the same channels of trade and are sold

---

[26] Bernecki Dec., ¶10.

[27] Bernecki Dec., ¶11.

[28] Applicant's Brief, p. 16.

to the same classes of consumers as furniture, housewares and home furnishings. That is not something we can or will do, because it would not be faithful to the underlying legal principle. When an application or registration fails to specify or limit the channels of trade of classes of customers, we must assume that the goods or services in question travel in all the normal channels of trade and to all prospective purchasers *for the relevant goods or services*. *See, e.g.*, *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012); *Kangol Ltd. v. KangaROOS U.S.A., Inc.*, 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992). Thus, when the dispute involves the comparison of *different* goods or services, this principle does not help the party asserting a likelihood of confusion unless there is further evidence that would permit a comparison of the normal trade channels for the parties' respective goods or sevices. That evidence is lacking here.

Second, and more important, that applicant could conceivably sell its nutritional, herbal, vitamin and mineral supplements through a retail store, catalogs and over the internet does not prove that opposer's goods and services and applicant's goods and services move through the same channels of trade and are sold to the same classes of consumers. For example, there is no evidence that any company rendering retail store services in the field of furniture, housewares and home furnishings, as well as restaurant and catering services, also sells nutritional, herbal, vitamin and mineral supplements. Under opposer's theory, any goods or services sold through retail stores, catalogs or over the Internet move through the

same channels of trade and, therefore, for all intents and purposes, all goods and services potentially move through the same channels of trade. *But see Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) (evidence that the only link between the goods is that they are sold in the same area of a supermarket is not sufficient to establish that the goods are related); *Parfums de Couer Ltd. v. Lazarus,* 83 USPQ2d 1012, 1021 (TTAB 2007) ("the mere fact that goods and services may both be advertised and offered through the Internet is not a sufficient basis to find that they are sold through the same channels of trade."); *Hi-Country Foods Corp. v. Hi Country Beef Jerky,* 4 USPQ2d 1169, 1171-72 (TTAB 1987) (there is "no 'per rule that all food products are related goods by … virtue of their capability of being sold in the same food markets."); *Nestle Co. v. Nash-Finch Co.,* 4 USPQ2d 1085, 1090 (TTAB 1987) ("the same availability of different food products in the same stores carrying a wide variety of food items in [sic] insufficient, in and of itself, to warrant a finding of likelihood of confusion.").

With respect to applicant's services of "providing advice and information in the field of career and business opportunities" and opposer's "educational courses and seminars in the fields of … personal development," there are no restrictions or limitations in the recitation of services. Therefore, it is presumed that opposer's services and applicant's services move in all channels of trade normal for those services, and that they are available to all classes of purchasers for those services. *See Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76 (CCPA 1973); *Kalart Co. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139

21

(CCPA 1958); *In re Linkvest S.A.*, 24 USPQ2d 1716, 1716 (TTAB 1992). Because, as previously stated, opposer's "educational courses and seminars in the fields of …. personal development" is broad enough to encompass applicant's services of "providing advice and information in the field of career and business opportunities," we find that the channels of trade and classes of purchasers for these services overlap.

E.     <u>The conditions under which and buyers to whom sales are made (*i.e.*, "impulse" vs. careful, sophisticated purchasing)</u>.

According to William Bernecki, applicant's Chief Operating Officer, applicant's products are not the subject of impulse purchases. Applicant "is a wellness company based on the philosophy that a healthier life can be achieved by studying and adopting the lifestyle habits of the people in the longevity hot spots, including their diets, [applicant's] customers generally are very careful about the substances that they put into their bodies."[29] Opposer, on the other hand, argues that "since there are no restrictions on the price levels of Applicant's goods in its application, the products Applicant intends to sell under the AKEA mark may be inexpensive."[30]

Applicant's Bernecki Exhibit No. 4 is a photocopy of its Internet shopping cart that Mr. Bernecki accessed from applicant's website. It has been designated as confidential. A printout of applicant's Shopping Cart webpage available to the

---

[29] Bernecki Dec., ¶21. A "longevity hot spot" is a community in which the population routinely live to between 90 to 100 years and do not suffer from chronic diseases or illnesses. (Bernecki Dec., ¶3).

[30] Opposer's Brief, p. 19.

public is not confidential. Applicant's products are not inexpensive. Various combinations of educational videos and supplements cost between $50 and $145.

Moreover, the significance of the price of applicant's products must be weighed against other factors such as the type of product and the conditions of purchase as described in the Bernecki Declaration. Low prices do not necessarily imply a low degree of consumer care in the selection of dietary supplements where the prospective consumers would be expected to exercise a reasonable degree of care regarding the products that they ingest to improve their health. *See Stouffer Corp. v. Health Valley Natural Foods, Inc.,* 1 USPQ2d 1900 (TTAB 1986), where the Board found that consumers exercised a reasonable degree of care even though the dinner entrees were relatively inexpensive.

> Considering the particular nature of the goods herein, we do not believe that purchasing decisions are apt to be made impulsively or carelessly, as would be the case of a child purchasing candy or a toy. Thus, even in the hustle and bustle atmosphere of a supermarket, diet-conscious purchasers of these prepared entrees are a special class of purchasers who may be expected, at least, to examine the front of the packages in order to determine what kind of entree is contained therein and its caloric content. On both of these parties' packages, as well as on most of the competitive brands, this information is prominently displayed in close association with the trademarks. Therefore, a lesser standard of care is not justified.

*Id.* at 1902. *See also Weight Watchers International v. I. Rokeach & Sons, Inc.*, 211 USPQ 700, 706 (TTAB 1981), *aff'd on other ground*, 576 F.Supp. 841, 216 USPQ 1090 (SDNY 1982) ("it seems to us that weight-conscious supermarket purchasers are quite apt to be more deliberate. Whether members of the program or not, such purchasers are inclined to examine labels carefully.").

We find that consumers who are potential purchasers of both opposer's goods and services and of applicant's products will exercise at least a moderate degree of consumer care when purchasing dietary supplements and, therefore, this *du Pont* factor weighs against finding that there is a likelihood of confusion.

F.      Balancing the factors.

1.      Applicant's goods in Class 5 and services in Class 44.

Although opposer's mark IKEA is famous for "retail store services in the field of furniture, housewares and home furnishing" and the marks IKEA and AKEA are similar, because of the differences in the goods and services and channels of trade and the degree of care that will be exercised by applicant's prospective purchasers, we find that applicant's mark for the goods in Class 5 and services in Class 44 are not likely to cause confusion with opposer's IKEA mark for opposer's goods and services.

2.      Applicant's services in Class 35.

Because the marks are similar, because opposer's "educational courses and seminars in the fields of … personal development" is broad enough to encompass applicant's services of "providing advice and information in the field of career and business opportunities" and because of the presumption that, because the services are in part legally identical, the services move in the same channels of trade and are sold to the same classes of consumers, we find that applicant's mark is likely to cause confusion with opposer's mark. In the context of likelihood of confusion, it is sufficient to find likelihood of confusion as to the entire class if likelihood of

confusion is found with respect to use of the mark on any item in a class that comes within the description of goods. *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981); *Apple Computer v. TVNET.Net, Inc.*, 90 USPQ2d 1393, 1398 (TTAB 2007). Accordingly, registration for all of applicant's class 35 services must be refused.

Dilution

The Trademark Act provides a cause of action for the dilution of famous marks. Sections 13 and 43(c) of the Trademark Act, 15 U.S.C. §§ 1063 and 1125(c) allow for oppositions based on dilution, with the latter section providing as follows (emphasis added):

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person **who, at any time after the owner's mark has become famous, commences use of a mark** or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Opposer contends that applicant's AKEA mark will "blur" the distinctiveness of opposer's IKEA mark. The Trademark Act defines dilution by blurring as follows:

> "[D]ilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.

Section 43(c)(2)(B) of the Trademark Act, 15 U.S.C. § 1125(c)(2)(B).

In deciding opposer's dilution claim, we consider the following factors:

1. Whether opposer's IKEA mark is famous and distinctive;

25

2.     Whether opposer's IKEA mark became famous prior to applicant's date of constructive use;[31] and

3.     Whether applicant's AKEA mark is likely to cause dilution by blurring the distinctiveness of opposer's IKEA mark.

*See Coach Services Inc. v. Triumph Learning LLC*, 96 USPQ2d 1600 (TTAB 2010) ("Coach Services"), *aff'd* 668 F.3d 1356, 101 USPQ2d 1713 (Fed. Cir. 2012). *See also National Pork Board v. Supreme Lobster and Seafood Co.,* 96 USPQ2d 1479, 1494-5 (TTAB 2010).

Even assuming that opposer's mark is famous for purposes of dilution, the record does not support our finding that opposer's mark became famous prior to the filing date of applicant's application. Opposer's evidence regarding fame is recounted above. This evidentiary showing is not sufficient to show that opposer's mark is famous for purposes of dilution because most of the evidence points to events that occurred after the filing date of applicant's application. For example, opposer's evidence that the IKEA brand was ranked No. 28 on the Business Week/Interbrand 2012 list of the Top 100 Brands worldwide, with an estimated

---

[31] While opposer did not properly plead the fame of its mark *prior to the earliest date on which applicant can rely for purposes of priority,* because applicant did not move to strike the dilution claim for failure to state a claim and, in its brief, treated the dilution claim as if it were properly pleaded, we deem the dilution claim to have been amended by implied consent of the parties. See Fed. R. Civ. P. 15(b). In other words, we deem the dilution claim to allege that opposer's IKEA mark became famous prior to the filing date of applicant's intent-to-use application.

brand value of $12,808,000,000 is subsequent to the filing date of applicant's application and, therefore, is not relevant.[32]

With respect to opposer's evidence of media attention regarding opposer's mark, only two articles referencing opposer were published prior to the filing date of the application: (1) Arrive: The Education Issue (from AMTRAK); and (2) a monitoring report of television and radio (March 8, 2009 and March 9, 2009) that listed eleven (11) references to opposer identifying a total audience of 1,005,739. The reference in the Arrive magazine was a short piece (quarter page) describing an IKEA computer desk. With respect to the monitoring report, of the eleven (11) references, five (5) reported an ongoing investigation regarding credit card fraud that targeted opposer and Target stores in the Orlando area, two were a consumer alert regarding a recall of opposer's coffee makers, and four were stories referencing opposer's products, including one that reported that the callers to a radio or television program in Las Vegas wanted opposer to open a store there. That last reference demonstrates opposer's renown; but it is only one reference that is limited to Las Vegas with an unidentified number of listeners for the program.

On this record, opposer cannot prevail on its dilution claim because we have found that opposer has not met its burden of proving that its IKEA mark became famous prior to the filing date of applicant's application.

---

[32] Since the application is based on intent-to-use, the earliest date upon which applicant may rely is the filing date of its application, June 17, 2009. Section 43(c) of the Trademark Act. *See also General Mills Inc. v. Fage Dairy Processing Industry SA,* 100 USPQ at 1595 n. 13 (an element of a dilution claim is the plaintiff's acquisition of fame prior to the defendant's first use or application filing date).

**<u>Decision</u>**: With respect to the applicant's services in Class 35, the opposition is sustained on opposer's claim under Section 2(d) alone and registration is refused.

With respect to applicant's goods in Class 5 and services in Class 44, the opposition is dismissed. A notice of allowance will be issued in due course.